In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3278

MICHAEL L. MCGEE,

Petitioner-Appellant,

v.

BYRAN BARTOW,

Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 1:06-cv-01151-WCG—**William C. Griesbach**, *Judge*.

ARGUED DECEMBER 5, 2008—DECIDED JANUARY 27, 2010

Before RIPPLE, KANNE and TINDER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. In 2003, Michael McGee was ordered to be civilly committed as a "sexually violent person" ("SVP") pursuant to Chapter 980 of the Wisconsin Statutes. After exhausting his state appeals and petitioning unsuccessfully for post-commitment relief in the state courts, he filed a petition for habeas corpus in the United States District Court for the Eastern District of Wisconsin, contending that his contin-

ued state custody deprives him of his right to due process of law. The district court denied the writ but issued a certificate of appealability on the question. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.

In 1987, Mr. McGee entered an apartment that he believed was vacant, apparently intending to rob it. Instead, he found a woman and her child asleep on the sofa. Mr. McGee then ordered the woman upstairs, where he raped her. Following the rape, Mr. McGee stayed in the victim's home until the next morning when she convinced him that she had to take her son to school, which he allowed her to do. As he accompanied his victim down the street he repeatedly apologized to her. After ensuring that her son had reached his school safely, the victim was able to escape to her mother's home. The victim identified Mr. McGee in a photographic line-up, and he later was convicted of burglary and sexual assault. He was sentenced to eight years' imprisonment and six years' probation.

In 1992, after serving five years of his sentence, Mr. McGee was released on parole. He subsequently was accused of two separate, additional incidents of sexual assault, one involving a woman and another involving an adolescent male, neither of which resulted in a con-

viction. His parole, however, was revoked, and he was returned to the physical custody of the Wisconsin authorities.

### B.

In 1995, before his mandatory release, the State of Wisconsin filed a petition seeking to have Mr. McGee declared a SVP under Chapter 980. He was civilly committed following a jury trial. This first civil commitment determination was reversed after a state court concluded that Mr. McGee's trial counsel in the commitment proceeding was ineffective for failing to discover evidence that undermined the credibility of the accusers in the 1992 incidents. Accordingly, in 1999, he was released from civil commitment.

In 2000, Mr. McGee's parole again was revoked after he tested positive for marijuana and had contact with the alleged victim of one of the 1992 assaults. Before his scheduled release, the State of Wisconsin again initiated proceedings to have Mr. McGee committed as a SVP.

### C.

The proceedings resulting in Mr. McGee's second civil commitment form the basis of his current petition for habeas relief. In those Chapter 980 proceedings, Mr. McGee represented himself at a bench trial.

The state presented two experts. First, the state called Dr. Caton Roberts, a psychologist employed by the Depart-

ment of Corrections and a university lecturer in psychology. Dr. Roberts testified that his evaluation was based upon fifteen hours of review of Mr. McGee's record; specifically relevant were Mr. McGee's various rule violations, difficulty staying out of trouble, physical altercations, criminal convictions and "pervasive impulsivity." R.16, Ex. 83 at 118-21. Based upon his review, Dr. Roberts testified that, in his opinion, Mr. McGee suffered from "a personality disorder not otherwise specified ["NOS"] with antisocial features." *Id.* at 119. Dr. Roberts believed that his diagnosis fit within the criteria listed in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") published by the American Psychiatric Association ("APA").[1] *Id.* at 119-20. He acknowledged that he could not diagnose Mr. McGee with Antisocial Personality Disorder ("APD") as described in the DSM because the record was devoid of any evidence of personality disorders before Mr. McGee reached the age of 15, an explicit requirement in the DSM for an APD diagnosis. *Id.* at 120-21. Dr. Roberts further testified that he had reviewed other proposed diagnoses in Mr. McGee's file by other examiners, but did not believe that they were supported in the record. Dr. Roberts specifically stated that he did not believe that the record supported a diagnosis of "a paraphili[c]

---

[1]   All references to the DSM refer to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, published by the American Psychiatric Association in 2000. In the profession, the text is sometimes referred to as the DSM-IV-TR. For the sake of simplicity, we use the shorthand "DSM."

disorder not otherwise specified." *Id.* at 120. In addition to his clinical diagnoses, Dr. Roberts testified about the use of two actuarial tools that support, in his judgment, a conclusion that Mr. McGee "was substantially probable to reoffend sexually if not detained and treated." *Id.* at 124.

The state also called Dr. Cynthia Marsh. Dr. Marsh testified that she was also a state-employed counselor and a university lecturer; she holds a Ph.D. in "urban education specializing in counseling psychology." *Id.*, Ex. 84 at 19. Dr. Marsh testified that she had diagnosed Mr. McGee with two mental illnesses that qualified him to be committed as a SVP: paraphilia NOS and a personality disorder NOS with antisocial features. *Id.* at 34-35. She stated that the "key characteristic" for a diagnosis of personality disorder was "disregard for and violation of the rights of others." *Id.* at 35. She acknowledged that she had based her diagnosis on Mr. McGee's history, including the sexual assault charges from 1992 that had proved problematic in his first commitment proceeding.

Dr. Marsh also testified about the results of three actuarial tools. She stated that subjects with scores similar to Mr. McGee's in each of these instruments reoffended at rates of between forty-eight and fifty-four percent over a six- to fifteen-year period following release. Her conclusion, based on her diagnoses and the actuarial tools, was that Mr. McGee was "much more likely than not to reoffend in a sexually violent manner." *Id.* at 39. Dr. Marsh was not subject to cross-examination because Mr. McGee had refused to participate in the second day of his commitment proceeding.

Based on the testimony of Drs. Roberts and Marsh, the state court ordered Mr. McGee committed as a SVP pursuant to Wis. Stat. § 980.06.

### D.

Following his commitment, Mr. McGee took an unsuccessful direct appeal and then petitioned, again unsuccessfully, for state collateral relief. Mr. McGee next filed a petition for habeas corpus in the United States District Court for the Eastern District of Wisconsin. The district court dismissed Mr. McGee's petition, but granted a certificate of appealability under 28 U.S.C. § 2253(c)(2). The substance of the state and federal proceedings are explored in significant detail below.

## II

### PROCEDURAL DEFAULT

As briefed to this court, Mr. McGee raises two challenges to his commitment. The first is whether confinement as a SVP on the basis of his diagnoses, which he claims lack a reasonable scientific foundation, violates due process of law. The second is whether, under the Supreme Court's decision in *Kansas v. Crane*, 534 U.S. 407 (2002), committing courts must ascertain whether the nature and specificity of a particular person's mental impairment is of a level which justifies civil confinement. In his view, this latter challenge focuses on whether the Wisconsin courts have failed to implement *Crane*

properly because the statute does not require that com-mitment is supported by a finding of a "special and serious lack of ability to control behavior." *Id.* at 413.

Before the district court, the State contended that all of Mr. McGee's claims were procedurally defaulted. Before this court, the State has abandoned a procedural challenge to the first issue Mr. McGee presents. As to the second issue, however, the State now contends that Mr. McGee failed to present it to the state courts, resulting in a pro-cedural default that would bar our consideration of the issue. It also argues, in the alternative, that even if the second issue regarding the application of *Crane* was properly before the state courts, Mr. McGee forfeited the argument in his federal habeas proceeding by failing to present it to the district court.

To inform our analysis of the procedural status of these claims, we begin with a detailed examination of the parties' positions at all stages of Mr. McGee's challenge to his commitment.

### A.

Mr. McGee appeared pro se for most of his commit-ment proceedings, including his trial, in the Wisconsin Circuit Court for Racine County. After he was ordered committed, he filed, pro se, a motion for relief from the judgment with the committing court. In that motion, he presented a variety of issues, one of which was identified by the court as a claim "that the diagnosis, essentially one of a personality trait [sic] is not sufficient

for the commitment." R.85 at 11. At his hearing on the motion, the nature of Mr. McGee's contentions was somewhat clarified by his repeated interruptions of counsel for the State to inquire what "not otherwise specified" meant as related to his diagnosis. *Id.* at 14. Mr. McGee called the diagnosis "bogus," *id.* at 15, and insisted that the State "basically made [the diagnosis] up," *id.* at 17. The circuit court denied the motion for relief from judgment.

Mr. McGee was represented by counsel on appeal. Prior to the appointment of counsel, he filed his own notice of appeal, in which he cited three bases to challenge the commitment. Specifically, he contended: (1) that his commitment was based on insufficient evidence that his "social history manifests the scientific diagnostic criteria of any mental and/or personality disorder"; (2) that confinement on the basis of his diagnosis "violates the substantive component of the Due Process Clause"; and (3) that the State's use of a personality disorder NOS diagnosis as the basis for confinement violated state law and due process "inasmuch [as the] condition [was] literally made up by" state psychologists. R.1, Attach. 6 at 1.

In counsel's brief to the appellate court, however, the challenge articulated was instead that Mr. McGee's burglary conviction could not serve as the predicate offense for a Chapter 980 proceeding because it was not a "sexually motivated" offense. R.10, Ex. B at 6. The Court of Appeals of Wisconsin affirmed. It does not appear, from the record before us, that Mr. McGee petitioned for discretionary review to the Supreme Court of Wisconsin.

**B.**

Following the Court of Appeals' affirmance of his commitment, Mr. McGee, again pro se, filed a habeas petition in the Court of Appeals of Wisconsin under *State v. Knight*, 484 N.W.2d 540 (Wis. 1992),[2] challenging his commitment with a claim of ineffective assistance of appellate counsel.[3] Although it is not a perfectly clear or well-organized brief, it does appear to raise and attempt to develop several issues relevant to the present proceeding. Mr. McGee's overarching contention to the Wisconsin court was that his appellate counsel was

---

[2] *State v. Knight*, 484 N.W.2d 540 (Wis. 1992), involved a collateral attack on a criminal conviction based on a claim of ineffective assistance of appellate counsel. The Supreme Court of Wisconsin held in *Knight* that the appropriate procedure for such an attack was a habeas corpus proceeding filed in the court that considered the direct appeal. *Id.* at 544-45. Such proceedings have come to be known in Wisconsin as "*Knight* petitions." *See, e.g., State ex rel. Panama v. Hepp*, 758 N.W.2d 806, 808 (Wis. Ct. App. 2008) (discussing the applicability of *Knight* petitions).

[3] Chapter 980 proceedings include a statutory right to counsel. *See* Wis. Stat. § 980.03(2)(a). The Supreme Court of Wisconsin has held that where a statutory right to counsel exists, it includes the right to effective assistance of counsel. *A.S. v. State*, 485 N.W.2d 52, 54 (Wis. 1992). Wisconsin applies the familiar deficiency and prejudice test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), for ineffective assistance claims based on a statutory right to counsel. *See State ex rel. Schmelzer v. Murray*, 548 N.W.2d 45, 48 (Wis. 1996).

ineffective for failing to raise various arguments related to his mental condition in the direct appeal. At trial, the State's experts had discussed Mr. McGee's scores on various actuarial tools and interpreted his results to demonstrate his probability of reoffending. In his *Knight* petition, Mr. McGee claimed that his scores, and thus his risk of recidivism, did not actually bear on the relevant question of whether he had a "mental condition" upon which civil confinement can be imposed consistent with due process. R.1, Attach. 3 at 2. He further contended that his confinement was based on a "non-demonstratable [sic] personality disorder," that it was a "tautology of an antisocial per[so]nality disorder," and that his diagnosis, by definition, "does not cause any inability to control behavior." *Id.* at 3. He also contended that the State's experts did not demonstrate "that mere features of an antisocial per[so]nality disorder can be diagnosed as a disorder under the category not otherwise specified in the (DSM)." *Id.* at 4. His NOS diagnosis, therefore, was not of an "actual mental condition" that could support confinement. *Id.* Finally, he contended that his diagnosis was "literally made up" and "only exist[s] in the minds of the chapter 980 evaluation team but nowhere else." *Id.* at 6.

The Court of Appeals of Wisconsin denied Mr. McGee's petition. After recounting the procedural history and confirming that a *Knight* petition was the proper vehicle for his challenges, the court turned to Mr. McGee's substantive contentions. Noting that the brief was "difficult to understand," the court construed the single issue that it could discern as a claim that appellate counsel was

ineffective for failing to challenge the use of actuarial tools as part of the diagnostic model. R.10, Ex. E at 4. It held that Mr. McGee's petition was "an attempt to retry" his commitment and noted that its earlier order upholding commitment was based on its assessment of his intent in committing the burglary, "not the experts' testimony." *Id.* The court continued without further explanation, that, "[t]herefore, even if appellate counsel had made such arguments, they would not have been successful." *Id.* The petition was denied "on the grounds that McGee was not prejudiced by his appellate counsel's performance." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

Mr. McGee, again proceeding pro se, next petitioned the Supreme Court of Wisconsin for discretionary review of his *Knight* petition. In his petition, he again raised appellate counsel's ineffectiveness for failing to challenge the sufficiency of his diagnoses. He also again contended that even if APD itself had been proved, it did not cause any inability to control behavior, sexual or otherwise. R.1, Attach. 1 at 1. The Supreme Court of Wisconsin denied review.

## C.

Mr. McGee, again proceeding pro se, filed a federal habeas petition under 28 U.S.C. § 2254. We shall endeavor to give his petition and his briefs the fairest reading with an eye toward the issues he wishes to present in the present appeal. *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004) (identifying the petition and brief as

documents a court should reference for determining whether the fair presentment requirement has been met).

Mr. McGee began by contending that he "cannot be clinically diagnosed *with anything*." R.8 at 2 (emphasis in original). Mr. McGee's briefing traced the history of his challenges to his commitment and repeatedly stated that he raised an issue regarding the application of the Supreme Court's decision in *Kansas v. Crane* and whether his "disorder" caused the required inability to control behavior. *Id.* at 4; *see also id.* at 12 (stating that a personality disorder diagnosis "without more" does not satisfy "the requirement of a mental condition that causes a lack of control"). He further claimed that the state courts had ignored the issue. *Id*.

Mr. McGee also contended, at some length, that his NOS diagnoses were lacking in validity and not accepted within the psychiatric community. He noted the variance between the diagnosis accepted in Wisconsin and the diagnostic criteria of related, generally accepted disorders as identified by the DSM.[4] *Id.* at 3-4; *see also id.* at 12-13 (listing the DSM criteria for APD and stating that it is "nothing but another way of saying 'Criminal'"); R.11 at 4 (quoting Justice Kennedy's concurring

---

[4] Although Mr. McGee sometimes uses the term "antisocial personality" to describe his diagnosis, it is clear that he is drawing a distinction between the actual APD diagnosis and the NOS diagnosis upon which he was committed. *See, e.g.*, R.11 at 3 ("[T]his petitioner does dispute whether *antisocial features alone* is a legitimate diagnosis." (emphasis in original)).

opinion in *Kansas v. Hendricks*, 521 U.S. 346, 372 (1997), for the proposition that Hendricks's disorder, pedophilia, "*is at least described in the* DSM[]" (emphasis added by petitioner)). In further briefing, he reiterated that the personality disorder NOS diagnosis was, in his view, "not a real diagnosis." R.11 at 4 (Response to the State's Motion to Dismiss).

The district court, exercising its obligations under Rule 4 of the Rules Governing Section 2254 Cases, reviewed the petition alone and concluded that summary dismissal was not appropriate. Accordingly, it ordered the State to file an answer to the claim that Mr. McGee's "incarceration under Chapter 980 violates the Constitution because it is based on a diagnosis of personality disorder that does not correspond to the requirements of due process." R.4 at 1 (citing *Kansas v. Crane*, 534 U.S. 407 (2002)).

The State of Wisconsin filed a motion to dismiss for procedural default, and Mr. McGee responded. The State's position was that Mr. McGee had failed to raise a due process challenge[5] to his commitment through one

---

[5]  The State acknowledges that Mr. McGee took a direct appeal and filed a subsequent *Knight* petition. R.10 at 2. In its memorandum in support of the motion to dismiss, the State vaguely refers to Mr. McGee's "brief in the Wisconsin Court of Appeals," *id.* at 4, as though there were only one brief. We take the State to be referring to Mr. McGee's direct appeal in which he was assisted by counsel, because the State notes

(continued...)

complete round of state court review. R.10 at 3-4 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 854 (1999) (Stevens, J., dissenting)). The State further argued that, although a claim for ineffective assistance of counsel was preserved through the *Knight* petition proceedings, counsel was not ineffective, and therefore Mr. McGee could not, by way of a right to counsel claim, establish cause and prejudice for the default of his due process claim.

In ruling on the motion, the district court carefully reviewed the history of Mr. McGee's commitment challenges and concluded that the due process claims had been presented fairly to the state courts. The district court acknowledged that Mr. McGee had failed to present the due process arguments on direct appeal, but noted that this was "hardly McGee's fault." R.12 at 8. The court construed Mr. McGee's *Knight* petition alleging ineffective assistance as raising a claim that counsel was ineffective for failing to contend

> that [his] diagnosis is essentially a "bogus disor-
> der" that was invented by state psychologists to
> justify his continued confinement after he com-
> pleted his sentence. . . . McGee also argued that an
> antisocial personality disorder, by definition, *does
> not cause inability to control one's behavior*. Thus, he
> claimed that his involuntary commitment on the
> basis of such a diagnosis violated his Fourteenth

---

[5] (...continued)
later that "no petition for review was filed," *id.*, a fact only true with respect to the direct appeal.

> Amendment right to due process of law as set
> forth by the United [States] Supreme Court in
> *Kansas v. Crane . . . .*

*Id.* at 6-7 (emphasis added) (citations omitted). In light of
this content in his *Knight* petition, the district court con-
cluded that the State had a fair opportunity "to consider
the gist of [] McGee's claim, which was that due
process was violated because of the state's reliance upon
a diagnosis not recognized in the field of mental health
as a basis to civilly confine an individual indefinitely."
*Id.* at 8.[6]

After briefing on the merits, the contentions of which
are outlined above, the court denied the writ. Because
the state courts had not adjudicated Mr. McGee's claim
on the merits, the district court noted that it was
required to "dispose of the matter as law and justice
require." R.26 at 2 (citing 28 U.S.C. § 2243).

The court then stated that, in its view, Mr. "McGee's
argument is quite narrow": that *his* particular diagnoses
do not "live up to the Supreme Court's requirements

---

[6] The district court, in its subsequent order on the merits,
acknowledged that the claim of ineffective assistance of
counsel for failure to raise the due process issues was the claim
actually exhausted. R.26 at 2 n.2. The due process challenges
were only presented to the state courts as embedded, not
independent claims. The district court continued, "[b]ecause
I find that the claim ultimately fails, it follows that his
appellate counsel was not ineffective for failing to raise it in
McGee's appeal." *Id.*

for due process." R.26 at 2-3. The court, relying on its interpretation of *Crane*, ruled that "just as there are no magic words, there are no magic diagnoses . . . . [F]or due process purposes, it matters little whether the disorder is described as 'antisocial personality disorder' or 'personality disorder with antisocial features.'" *Id.* at 3. The court then reviewed the record and concluded that Mr. McGee's confinement was not based solely on a "personality disorder," but on a substantial probability of reoffense, appropriately evaluated (contrary to Mr. McGee's contentions as interpreted by the district court) by the use of actuarial risk assessment models. The district court held that Mr. McGee properly had been "found to be a SVP based on testimony that he had a mental disorder that caused him to have serious difficulty controlling his behavior." *Id.* at 5.

### D.

Mr. McGee, still pro se, petitioned the court for a certificate of appealability. In his petition, he identified four issues. The first two relate to his claim that a diagnosis of a personality disorder NOS is an invalid and unrecognized creation of the Wisconsin Chapter 980 team. The third claims that the district court sidestepped the diagnostic validity issue when it found that Mr. McGee was not confined "solely" on the basis of his diagnosis, but on a finding of a substantial probability of reoffense. R.26 at 4-5. Finally, Mr. McGee's fourth claim references the opinion of the district court in a related case, brought by Bruce Brown. Specifically, Mr. McGee quotes that

court on the subject of Mr. Brown's paraphilia NOS diagnosis and its conclusion that a petitioner may be able to show that it does not distinguish between the dangerous but typical recidivist, as required by Supreme Court precedent. Mr. McGee seems to contend that his diagnoses, particularly the personality disorder, are infirm for the same reason.

The district court issued a certificate of appealability on the "single issue" raised in Mr. McGee's habeas petition: "that his diagnosis for personality disorder does not qualify under the Supreme Court's due process requirements for involuntary incarceration." R.34 at 1. The district court continued, "[i]n essence, he believes the State of Wisconsin manufactured a bogus diagnosis, unrecognized out of the state's own corridors, in order to keep him locked up." *Id.*

### E.

Mr. McGee briefs his due process challenge to his commitment as comprising two elements, first, that his diagnoses are medically invalid and unrecognized, and second, that Wisconsin has failed to implement *Crane* by requiring a finding that the nature and severity of a particular diagnosis cause a "special and serious lack of ability to control behavior." 534 U.S. at 413. The State had claimed, in the district court, that Mr. McGee's claims were procedurally defaulted. The State now makes that claim only with respect to the second element of Mr. McGee's due process challenge, that is, with respect to the claim that Wisconsin procedures do not satisfy

*Crane.*[7] The State further argues that this second element is not encompassed within the certificate of appealability and was forfeited by Mr. McGee in the district court.

If the State is correct that Mr. McGee did not present his claims in state court, the consequence is significant. Failure to present fairly claims through one complete round of state court review works a procedural default, barring a federal court from review of the substance of a habeas petition, unless a petitioner can establish cause and prejudice to excuse the default or can establish that failure to consider his claims will result in a fundamental miscarriage of justice. *See Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009).

Upon review of the history of the proceedings, we cannot agree with the State regarding the matters properly before this court. We are mindful of our obligation to construe liberally the submissions of Mr. McGee when he proceeded pro se. *See Wyatt v. United States*, 574 F.3d 455, 459 (7th Cir. 2009) (noting that it is appropriate to construe district court habeas filings by pro se petitioners liberally); *Osagiede v. United States*, 543 F.3d 399, 405 (7th Cir. 2008) (construing liberally a request for a

---

[7] At oral argument, the attorney for the State told us that while he did not "agree" with the district court regarding its holding on default, it was not so far off the mark, in his view, that the State would argue it was erroneous. The State's argument, therefore, is that the district court's ruling (and Mr. McGee's presentations in that court) only encompassed the first element of the current challenge.

certificate of appealability); *Lewis v. Sternes*, 390 F.3d 1019, 1027 (7th Cir. 2004) (noting that it was proper to make a "generous interpretation" of a habeas petitioner's state court filings in considering default). Mr. McGee, who has not completed high school, has navigated the bulk of his commitment proceedings, his state collateral review, and, until his arrival at this court, his federal habeas proceeding without the assistance of counsel. The singular prior stage at which he accepted the assistance of counsel was his state direct appeal. Prior to counsel's appointment on direct appeal, Mr. McGee indicated an intent to raise the very issues before us today. Counsel chose not to pursue those issues, and, at his next opportunity, Mr. McGee argued that counsel's performance rose to the level of ineffective assistance because of that choice. While his claims were not presented artfully, the "basic rationale" of Mr. McGee's due process challenge was "readily discernible" in the state courts and in the district court. *Perruquet v. Briley*, 390 F.3d 505, 512 (7th Cir. 2004).

Mr. McGee never stated, as directly as he does in his brief to this court, that as a consequence of *Crane*, the Chapter 980 process was infirm for failing to require a separate factual finding of a special and serious inability to control behavior. Instead, Mr. McGee simply and repeatedly stated that, with respect to his own diagnoses, the State did not and could not demonstrate an inability to control behavior. *See, e.g.*, R.1, Attach. 3 at 2, 3 (*Knight* petition); R.1, Attach. 1 at 1 (Petition for Review of *Knight* petition). We also note that the district court's summation of the state court proceedings recognized that

the due process issue presented challenges to the validity of the diagnoses themselves *and* their sufficiency under *Crane*'s impairment standard. *See* R.12 at 6-7 (characterizing the challenge in the state court as whether he was diagnosed with "a 'bogus disorder' that . . . . by definition, *does not cause inability to control one's behavior* . . . . [such] that his involuntary commitment . . . violated his Fourteenth Amendment right to due process of law as set forth by the United [States] Supreme Court in *Kansas v. Crane*").

The district court was correct. The two arguments Mr. McGee makes are part of the same basic due process challenge, and both elements were part of his submissions in both the state court in his *Knight* proceeding and the district court. *See Sweeney v. Carter*, 361 F.3d 327, 333 (7th Cir. 2004) (noting that "a mere variation in legal theory" does not work a procedural default and that "a petitioner may reformulate her claims so long as the substance of the claim remains the same") (internal quotation marks omitted); *see also United States ex rel. Nance v. Fairman*, 707 F.2d 936, 940 (7th Cir. 1983) (drawing a distinction between the effect of a "mere variation" in legal theory and a "different legal claim" for procedural default purposes). If we were to find the second element of his challenge lacking in any respect, it would be that there is no direct reference to it in the request for a certificate of appealability; but, as the State acknowledges, this is not a fatal failing because our court would be at liberty to consider his briefing of the

issue as a request for expansion of the certificate.[8] Because we perceive the second element to be part of the same due process challenge, however, we see no need to expand the certificate, which itself only purported to distill Mr. McGee's claim to its "essence," not present it in detailed particulars. R.34 at 1.

The State's reliance on the opinions of the district court to justify limiting the issues presented in the case is misplaced. The district court attempted to give fair treatment to a muddled pro se pleading when it described, at various times, the gist or essence of Mr. McGee's submissions. We do not take those distillations to be attempts by the district court to narrow the issues before it rather than simple attempts to understand the presentation made to it. In any event, we are not limited to the district court's characterizations of the pleadings before it in considering the issue of forfeiture, just as the district court was not limited by the state court's characterizations of Mr. McGee's submissions when it considered the issue of default and concluded, contrary to the Court of Appeals of Wisconsin, that the due process challenge was fairly presented.

Upon review of the state court record, we view Mr. McGee's challenge regarding the *Crane* lack of control

---

[8] Although the State has told us that it has *not* briefed the issue, Appellee's Br. 2-3, and will do so only upon further order of the court, its brief actually does address this issue in substance. *See id.* at 17-22. With the position of the State so before us, we have determined that further briefing of this issue is unnecessary.

requirement to be on the same basic footing as his challenge to the validity of the diagnoses themselves. The operative facts and the guiding legal principles were presented to the state court. *See Sweeney*, 361 F.3d at 332.[9] The two issues, to the extent they are at all separable, are inextricably linked.

In sum, we conclude that Mr. McGee neither has procedurally defaulted nor forfeited his claims, and, therefore, we shall proceed to consideration on the merits.

## III

### CONTROLLING PRECEDENT

We begin with an examination of the Supreme Court's guidance on civil commitment. When the Court has examined the issue of civil commitment, it has reaffirmed the principle that, when strict procedural and substantive requirements are satisfied fully, commit-

---

[9] We acknowledge that the due process challenges were presented to the state courts as embedded within claims of ineffective assistance. We do not understand the State's argument, however, to be that the claims are defaulted because they were embedded. *See Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). In any event, we have recognized that in some circumstances, where ineffective assistance claims are presented "as a means to reach" the embedded claims and those claims are the real substance of a petitioner's challenge, we will consider them fairly presented. *See Malone v. Walls*, 538 F.3d 744, 755 (7th Cir. 2008).

ment is a legitimate exercise of the authority of the state and consistent with "our understanding of ordered liberty." *Kansas v. Hendricks*, 521 U.S. 346, 357 (1997). When the process is lacking in either substance or procedure, however, the Court has not hesitated to reject a commitment as violative of due process.

### A.

In *Foucha v. Louisiana*, 504 U.S. 71 (1992), the Court examined the claim of a man who was detained indefinitely after having been found not guilty by reason of insanity. Specifically, a state statute provided for the automatic commitment of an insanity acquittee in a psychiatric hospital and permitted continued confinement until the acquittee himself could prove that he was no longer "dangerous," whether or not he was then mentally ill. *Id.* at 73.

Foucha was found not guilty by reason of insanity on charges of burglary and discharge of a firearm and was committed to the custody of a psychiatric hospital. After four years of confinement, facility officials recommended Foucha for discharge. As required by statute, a hearing was held on his eligibility for release. The trial court appointed the experts who conducted his pretrial examination, and they concluded that Foucha was not then mentally ill. At the hearing, one of the doctors testified that, although Foucha was in "good shape" mentally, he had an antisocial personality and had been involved in altercations in the facility. *Id.* at 75. As a result, the doctor was not "comfortable in certifying" that Foucha was no

longer dangerous. *Id.* The trial court determined that Foucha had not carried the burden of proving that he was no longer dangerous and ordered his recommit-ment. The Louisiana Supreme Court affirmed.

Before the Supreme Court of the United States, con-sistent with the testimony of its expert, Louisiana did not contend that Foucha was "mentally ill" at the time that he sought release, *id.* at 78; instead, it contended "that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely," *id.* at 82. The Court disagreed:

> This rationale would permit the State to hold indefinitely any other insanity acquittee not men-tally ill who could be shown to have a per-sonality disorder that may lead to criminal con-duct. The same would be true of any convicted criminal, even though he has completed his prison term. It would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and aside from permissible confine-ments for mental illness, incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law.

*Id.* at 82-83. The Court ruled that the basis for continued detention of Foucha as an insanity acquittee had "disap-peared," *id.* at 78, and, therefore, his commitment no longer satisfied the requirement of due process that "the

nature of commitment bear some reasonable relation to the purpose for which the individual is committed," *id.* at 79; *see also id.* at 88 (O'Connor, J., concurring) ("I think it clear that acquittees could not be confined as mental patients absent some medical justification for doing so; in such a case the necessary connection between the nature and purposes of confinement would be absent."). Accordingly, the Court ruled that Louisiana was not entitled to continue to confine Foucha absent "constitutionally adequate procedures to establish the grounds for his confinement." *Id.* at 79. Because Louisiana had not shown "by clear and convincing evidence that [Foucha was] mentally ill and dangerous," consistent with existing precedent on civil commitment, his continued confinement was held to be constitutionally infirm. *Id.* at 80.

**B.**

Several years later, in *Kansas v. Hendricks*, 521 U.S. 346 (1997), the Court again examined the issue of civil confinement, this time in the context of sex offenders. Petitioner Hendricks had a long history of serious sexual abuse of children and had been diagnosed with pedophilia. He admitted an uncontrollable urge to molest children. He was committed pursuant to Kansas's Sexually Violent Predator Act, under which persons proven by clear and convincing evidence to have a "mental abnormality" that makes them "'likely to engage in . . . predatory acts of sexual violence'" were eligible for civil commitment. *Id.* at 352 (quoting Kan. Stat. § 59-29a02(a)). On appeal, the

Kansas Supreme Court reversed, holding the Kansas statute unconstitutional under *Foucha*. The term "mental abnormality," it ruled, did not meet the requirement of establishing a "mental illness" sufficient to support confinement. *Id.* at 356.

The Supreme Court reversed. It concluded that substantive due process was satisfied by the statute's requirement of a "mental abnormality." *Id.* at 359. The Court acknowledged, as it had in *Foucha*, that "freedom from physical restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Id.* at 356 (internal quotation marks and citation omitted). That liberty interest, the Court continued, "is not absolute," *id.* at 356; in "certain narrow circumstances" states have "provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety," *id.* at 357. The Court noted that it has "consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards." *Id.* State statutes generally do not pass constitutional muster premised on a "finding of dangerousness, standing alone," but have been deemed constitutionally adequate when they have "coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Id.* at 358. This additional factor, the Court held, "serve[s] to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.*

The Court was careful to note that the term "mental illness," used in *Foucha* to identify the required "additional factor," was "devoid of any talismanic significance." *Id.* at 358-59. Not only had the Court itself referred to this additional factor under many different names, but, perhaps more importantly, " 'psychiatrists disagree widely and frequently on what constitutes mental illness.' " *Id.* (quoting *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985)). The Court continued:

> [W]e have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance. *Cf. Jones v. United States*, 463 U.S. 354, 365, n. 13 (1983). As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions employed by the medical community. . . . Legal definitions . . . which must "take into account such issues as individual responsibility . . . and competency," need not mirror those advanced by the medical profession. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders xxiii, xxvii (4th ed. 1994).

*Id.* (modification of quotation in original). In Hendricks's case, he had been diagnosed with a condition that "the psychiatric profession itself classifies as a serious mental

disorder." *Id.* at 360. His diagnosis, together with his admitted lack of volitional control and the predictions relating to his future dangerousness, "adequately distinguishe[d] Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Id.* at 360. The Court, therefore, upheld Hendricks's commitment and the Kansas statute's structure as consistent with due process.

Concurring in the judgment, Justice Kennedy agreed that the Kansas statute "is within [the] pattern and tradition of civil confinement." *Id.* at 372 (Kennedy, J., concurring). He specifically noted that the condition at issue, pedophilia, "is at least described in the DSM[]." *Id.* Although fully joining in the Court's opinion, he concluded: "If, however, civil confinement were to become a mechanism for retribution or general deterrence, or if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." *Id.* at 373.

Justice Breyer, writing in dissent, agreed with the majority's conclusion that Hendricks's commitment did not violate due process. He first noted, in agreement with the majority, that "the Constitution gives States a degree of leeway" in establishing the necessary criteria for commitment. *Hendricks*, 521 U.S. at 375 (Breyer, J., dissenting). Like Justice Kennedy, Justice Breyer also noted that Hendricks's disorder *was* a recognized disorder by the psychiatric community, listed in the DSM. Justice Breyer continued:

> I concede that professionals also debate whether or not this disorder should be called a mental "illness." But the very presence and vigor of this debate is important. The Constitution permits a State to follow one reasonable professional view, while rejecting another. The psychiatric debate, therefore, helps to inform the law by setting the bounds of what is reasonable, but it cannot here decide just how States must write their laws within those bounds.

*Id.* (internal citations omitted). Moreover, the effect of the disorder on Hendricks himself did "not consist simply of a long course of antisocial behavior, but rather it includes a specific, serious, and highly unusual inability to control his actions." *Id.* Finally, the result of his inability to control his urges posed a very serious danger to children. Under these circumstances, Justice Breyer, while dissenting on the ground that Kansas had violated the Ex Post Facto Clause, concluded that Kansas had acted permissibly in classifying Hendricks as mentally ill and dangerous as those terms had been used in *Foucha.*

## C.

Five years later, in *Kansas v. Crane*, 534 U.S. 407 (2002), the Court again took up a due process challenge to civil commitment. Crane was a convicted sex offender diagnosed with exhibitionism and antisocial personality disorder. He was ordered committed under the same Kansas statute at issue in *Hendricks*. After *Hendricks*, the

Kansas Supreme Court interpreted due process to require a finding of a complete lack of volitional control to support civil commitment and ruled Crane's civil commitment unconstitutional. The State of Kansas sought review, and the Supreme Court vacated the judgment.

The Supreme Court held that *Hendricks* did not require a determination that the committed individual had a *complete* lack of control. Instead, the Court clarified, "*Hendricks* underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Id.* at 412 (internal quotation marks and citations omitted). That distinction was made in *Hendricks* in part by the "presence of what the psychiatric profession itself classifie[d] . . . as a serious mental disorder." *Id.* (internal quotation marks omitted) (modification in original). The Court further noted that a "critical distinguishing feature" of the serious disorder in *Hendricks* was "a special and serious lack of ability to control behavior." *Id.* at 412-13. What due process requires in this context, the Court determined, is

> proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil

> commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

*Id.* at 413. The Court acknowledged the imprecision in its definition but noted that "the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules." *Id*. It must be so, the Court reasoned, to respect the "considerable leeway" of states in defining the conditions that make individuals eligible for commitment. *Id.* Moreover, "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." *Id.*

In an additional section of its opinion, the Court noted that, although volitional impairment had been at the center of its analysis in *Hendricks*, which dealt with an individual suffering from pedophilia, the Court had not drawn "a clear distinction between the purely 'emotional' sexually related mental abnormality and the 'volitional.'" *Id*. at 415. "Nor," the Court continued, "when considering civil commitment, have we ordinarily distinguished for constitutional purposes among volitional, emotional, and cognitive impairments. The Court in *Hendricks* had no occasion to consider whether confinement based solely on 'emotional' abnormality would be constitutional, and we likewise have no occasion to do so in the present case." *Id.* (internal citations omitted).

In dissent, Justice Scalia contended that the majority had "gutt[ed]" *Hendricks*, and had introduced significant uncertainties in precisely how state courts could conduct

commitment proceedings; requiring commitment to be supported by some degree of inability to control behavior "displays an elegant subtlety of mind," but, he noted, does little to instruct trial courts conducting commitment proceedings. *Id.* at 422, 423 (Scalia, J., dissenting).

Against this backdrop, we now turn to an analysis of the case before us.

## IV

## ANALYSIS

### A.

As in all habeas corpus proceedings under 28 U.S.C. § 2254, the successful petitioner must demonstrate that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). For claims actually "adjudicated on the merits in State court proceedings," the statute commands that we undertake a limited review. *Id.* § 2254(d). We evaluate the record to discern only whether the state court's adjudication of the claim (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or (2) "was based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2).

These narrow and deferential standards of review do not apply, however, where the relevant state courts did not adjudicate the claims presented on a federal

habeas petition. *Cheeks v. Gaetz*, 571 F.3d 680, 684-85 (7th Cir. 2009). In such cases, we apply the general standard of review contained in 28 U.S.C. § 2243, which directs that we "dispose of the matter as law and justice require." *Id.*[10]

**B.**

We first address Mr. McGee's challenges to the Wisconsin civil commitment procedures. He claims that the procedures fail to ensure, in the language of *Crane*, that commitment be ordered only upon some "proof of serious difficulty in controlling behavior." 534 U.S. at 413. In Mr. McGee's view, this language necessarily requires, in each case, an explicit *finding* of some inability to control behavior. Because his committing court made no such finding, Mr. McGee contends that his commitment violates the due process standards set forth in *Crane*. We considered and rejected a similar challenge to Wisconsin procedures in *Laxton v. Bartow*, 421 F.3d 565 (7th Cir. 2005), but the posture of that case called for highly deferential review under 28 U.S.C. § 2254(d). In Laxton's direct challenge to his commitment, the state court had determined that its statute satisfied *Crane* in the absence of a specific finding. On habeas review, we found that interpretation of *Crane* not unreasonable. *Id.* at 572. We now take up the same question here, when our review, for reasons explained above, is de novo.

---

[10] We have equated this standard with de novo review. *See Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008).

We begin with the guidance provided by the Supreme Court cases we have discussed. In *Crane*, the Court held that the Constitution would not permit civil confinement ordered "without *any* lack-of-control determination." 534 U.S. at 412 (emphasis in original). Such a determination was necessary, the Court continued, to "distinguish[] a dangerous sexual offender subject to civil commitment from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Id.* (internal quotation marks omitted). To satisfy this purpose, the Constitution requires "proof of serious difficulty in controlling behavior," which, admittedly, "will not be demonstrable with mathematical precision." *Id.* at 413. This proof, when viewed in light of the nature and severity of the diagnosis at issue, the Court reiterated, limits civil commitment to the subset of offenders whose "illness, abnormality, or disorder," renders them dangerous and thus forms a constitutional basis for indefinite state custody. *Id*. As we have noted earlier, the explicitness of this guidance, or at least the universality of its application, was placed in question by the ensuing section of the Court's opinion that noted that the Court has not drawn a distinction between volitional, emotional and cognitive impairments.[11]

---

[11] Writing in dissent, Justice Scalia contended that the majority had misread *Kansas v. Hendricks*, 521 U.S. 346 (1997), to "establish[] the requirement of a *finding* of inability to control behavior." *Kansas v. Crane*, 534 U.S. 407, 419 (2002) (Scalia, J., dissent-
(continued...)

State and federal courts have been non-uniform in their interpretation of *Crane* with respect to the issue of whether a separate finding is required. The majority of jurisdictions to have considered whether *Crane* imposed a new requirement of a separate *finding* of serious difficulty to control behavior have concluded that it does not. *See Richard S. v. Carpinello*, 589 F.3d 75, 83-84 (2d Cir. 2009) (collecting cases accepting both positions and adopting the majority view).

This case does not require that we answer these broad questions. Mr. McGee contends only that the committing court failed to make a necessary determination about his inability to control his behavior; he does not contend that the State impermissibly relied solely upon an "emotional impairment." Moreover, although the committing court did not make a specific finding about his inability to control his behavior, we believe that such a finding was implicit in the findings that the committing court did make under the specific provisions of the Wisconsin statute.

---

[11] (...continued)

ing) (emphasis in original). In the view of the dissenting Justices, *Hendricks* had ruled that the Kansas statute's "*causal connection* between the likelihood of repeat acts of sexual violence and the existence of a 'mental abnormality' or 'personality disorder' *necessarily* establishes 'difficulty if not impossibility' in controlling behavior." *Id.* (emphasis in original). That is, the Kansas statute at issue in *Hendricks* and again in *Crane* passed constitutional muster because an inability to control behavior is implicit in a scheme that requires a nexus between a disorder and the likelihood of recidivism.

The Wisconsin statute applies only to *sexually* violent persons. In the Wisconsin scheme, a "sexually violent person" eligible for commitment is defined as:

> a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect, or illness, and *who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence.*

Wis. Stat. § 980.01(7) (emphasis added). The term "mental disorder" is further defined as "a congenital or acquired condition *affecting the emotional or volitional capacity* that predisposes a person to engage in acts of sexual violence." *Id*. § 980.01(2) (emphasis added). Unlike the Kansas statute at issue in *Hendricks* and *Crane*, personality disorders are not listed as a separate and independent statutory basis upon which commitment could be based; Wisconsin instead has interpreted the term "mental disorder" to encompass personality disorders. *See In re Commitment of Adams*, 588 N.W.2d 336, 340 (Wis. Ct. App. 1998).

The requirement of some inability to control behavior, which the *Crane* dissenters contended was *implicit* in the Kansas scheme, has been made an explicit element of eligibility for civil confinement in Wisconsin. The Wisconsin statute expressly requires that, in order to

satisfy the legal definition of a "mental disorder," the committed person must suffer from an emotional or volitional impairment. Wis. Stat. § 980.01(2). Moreover, the Supreme Court of Wisconsin has interpreted this statute to require a connection between the person's mental condition and the individual's dangerousness. *See In re Commitment of John Laxton*, 647 N.W.2d 784, 792-93 (Wis. 2002) (referencing the definition of a SVP in § 980.01(7), *supra*). A person can be adjudicated a sexually violent person only if the person is dangerous *because* he suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence. The requirement of a connection between the mental disorder in the functioning of the person's emotional or volitional capacity *and* his likelihood of engaging in sexual violence "necessarily and implicitly requires proof that the person's mental disorder involves serious difficulty for such person in controlling his or her behavior." *Id.* at 793-94. When a Wisconsin court makes a finding that an individual has a "mental disorder" within the meaning of the statute, that court has necessarily found that emotional or volitional capacity is impaired. *See* Wis. Stat. § 980.01(2). Thus, the critical element identified as lacking in *Crane*, "proof of serious difficulty in controlling behavior," 534 U.S. at 413, is an existing requirement under Wisconsin law.

## C.

As we have noted, Mr. McGee was diagnosed with two conditions that were offered to establish the requisite "mental disorder" that made him substantially probable to commit future acts of sexual violence. *See* Wis. Stat. § 980.01. Dr. Roberts diagnosed him with a personality disorder NOS with antisocial features; Dr. Marsh agreed with that diagnosis and further diagnosed him with paraphilia NOS-nonconsent.

Mr. McGee asks us to hold that neither diagnosis suffices for due process purposes. First, he contends that both are "invalid and unreliable 'disorders.'" Appellant's Br. 10. Specifically, Mr. McGee notes that, while both diagnoses were purportedly arrived at after consideration of the diagnostic criteria in the DSM, neither is a listed and defined disorder. Instead, both diagnoses derive from catchall "not otherwise specified" categories of disorders.[12] As a result, the specific diagnoses at issue lack generally accepted, standardized diagnostic criteria. Moreover, Mr. McGee contends that the failure of the APA to include the disorders within the DSM

---

[12] The DSM identifies broad classes of disorders (e.g., "Anxiety Disorders") and lists within each class specific, related disorders (Panic Disorder, Social Phobia, Obsessive-Compulsive Disorder, etc.), each of which are discussed in some detail and guidelines for the diagnosis of which are provided. Each class of disorder also includes at least one "not otherwise specified" category, for which brief, non-exhaustive *examples*, but no specific diagnostic criteria, are provided.

demonstrates that the consensus view in the profession does not find the disorders valid or reliable. Mr. McGee also claims that, even if the use of "not otherwise specified" categories is not categorically infirm, additional problems with his diagnoses have resulted in a denial of due process. He claims that he cannot be diagnosed legitimately with any personality disorder because all personality disorders require, as a diagnostic criterion, presentation in adolescence; the diagnosing professionals acknowledged at trial that no adolescent presentation had been documented in his case. Finally, he claims that the diagnosis of paraphilia NOS (nonconsent or rape) represents an extreme minority viewpoint in the profession that has been explicitly and publicly rejected by the APA in crafting the DSM.

### 1.

Because Mr. McGee's contentions rely heavily upon the DSM, we begin with some observations about the text. According to the editors, the "highest priority" of the text is "to provide a helpful guide to clinical practice." DSM, xxiii. The editors refer to it as "[a]n official nomenclature," and, as such, make clear that it "must be applicable in a wide variety of contexts" including environments for clinicians and researchers, as well as health and mental health professionals. *Id.* With respect to fields outside of these medical and psychological settings, the text includes a "Cautionary Statement," which provides:

> The specified diagnostic criteria for each mental disorder are offered as guidelines for making

diagnoses, because it has been demonstrated that the use of such criteria enhances agreement among clinicians and investigators. The proper use of these criteria requires specialized clinical training that provides both a body of knowledge and clinical skills.

These diagnostic criteria and the DSM-IV Classi-fication of mental disorders *reflect a consensus of current formulations of evolving knowledge in our field. They do not encompass, however, all the condi-tions for which people may be treated or that may be appropriate topics for research efforts.*

The purpose of DSM-IV is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat people with various mental disorders. *It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category* such as Pathological Gambling or Pedophilia *does not imply that the condition meets legal or other non-medical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific considerations involved in categorization of these conditions may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disabil-ity determination, and competency.*

DSM, xxxvii (emphasis added).

With respect to the circumstances of forensic evaluations, the DSM includes a specific response. The editors note

the "imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis" and the resultant "risks and limitations." *Id.* at xxxiii. The text explicitly mentions that a DSM-based diagnosis "does not carry any necessary implications regarding the individual's degree of control over [his] behavior[] . . . . Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time." *Id.*; *see also Barefoot v. Estelle*, 463 U.S. 880, 920 (1983) (Blackmun, J., dissenting) (quoting the Brief for the American Psychiatric Association as Amicus Curiae for the proposition that "[t]he unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession"). Clearly, however, the APA is aware that its text *is* used for forensic purposes, even though standardization in that context was not a goal of the APA in drafting the DSM. The text notes the value of "the use of an established system of diagnosis," as is provided in the DSM, to "enhance[] the value and reliability" of legal determinations, including those relevant to involuntary civil commitment. DSM, xxxiii.

Despite its limitations in a non-medical setting, the DSM is a highly influential and useful tool. The Supreme Court has cited the DSM authoritatively, most notably in *Crane*. 534 U.S. at 411, 414; *see also Hendricks*, 521 U.S. at 372 (Kennedy, J., concurring) (noting with approval that the disorder which formed the basis of the commitment proceedings was "at least described in the DSM[]"). Many

mental health professionals have advocated that a valid, DSM-recognized diagnosis be a necessary, but not sufficient, condition for involuntary civil commitment.[13]

Whether a legitimate mental health diagnosis must be based on the DSM is a question for the members of the mental health profession, and, therefore, one to which we do not address ourselves. Our concern is with the due process requirements for the relevancy and legitimacy of evidence adduced in civil commitment proceedings. In that narrow legal context, we cannot adopt any rule that asks the DSM to do what the text itself professes that it was not intended to do: answer ultimate legal questions or create a perfect fit between law and medicine in the realm of involuntary civil commitment.

---

[13] *See, e.g.*, John Matthew Fabian, *To Catch a Predator, And Then Commit Him for Life*, 33 Champion 44, 49 (Feb. 2009) (noting that it "is critical . . . that psychiatric and psychological clinicians who testify in good faith as to mental abnormality are able to identify psychiatric disorders that are defined in the DSM[]"); Robert A. Prentky et al., *Sexually Violent Predators in the Courtroom: Science on Trial*, 12 Psychol. Pub. Pol'y & L. 357, 364 (2006) ("The classification of a syndrome as a mental disorder in the DSM[] must be regarded as the primary standard for medical validity in the SVP context."); Brett Trowbridge & Jay Adams, *Sexually Violent Predator Assessment Issues*, 26 Am. J. Forensic Psychol. 29, 37 (2008) ("Although a diagnosis of a DSM[] mental disorder is not sufficient in and of itself to meet [the civil commitment] standard, it nevertheless permits the evaluator to utilize accepted diagnostic categories and thus go beyond mere opinion or speculation.").

Not only has the Supreme Court cautioned that bright-line rules are often an ill-fit for this context, *see Crane*, 534 U.S. at 413, it has spoken directly to the issue of medical evidence in commitment proceedings: "[T]he science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." *Id.*; *see also Hendricks*, 521 U.S. at 359 ("Legal definitions . . . need not mirror those advanced by the medical profession."). Having made clear in *Foucha* that dangerousness without proof of some underlying mental condition is not sufficient to sustain an involuntary commitment, the Court's more recent statements have reflected the need to provide states with "leeway" in crafting legal standards reflecting the available science. *Crane*, 534 U.S. at 413; *Hendricks*, 521 U.S. at 374 (Breyer, J., dissenting).

The Supreme Court's cases on this point teach that civil commitment upon a finding of a "mental disorder" does not violate due process even though the predicate diagnosis is not found within the four corners of the DSM. A factfinder may have stronger confidence in his conclusions when the examining mental health professionals rely upon authoritative, consensus materials in the field. *See Crane*, 534 U.S. at 412 (noting that, in *Hendricks*, the committed person was distinguished from other dangerous persons not subject to commitment, in part by the "presence of what the psychiatric profession itself classifie[d] . . . as a serious mental disorder" (modification in original) (internal quotation marks omitted)); *Hendricks*, 521 U.S. at 372 (Kennedy, J., concurring)

(finding support for the conclusion that the commit-
ment was lawful in the fact that the diagnosis at issue "is
at least described in the DSM[]"). Indeed, reliance on
such a respected source permits reliability that should
not be minimized when so grave a restriction of
individual liberty is at issue. Likewise, when a particular
diagnosis is not accepted or is explicitly rejected by the
DSM or other authoritative sources, that factor is a
highly relevant consideration for the factfinder. In
either situation, however, the factfinder has the ultimate
responsibility to assess how probative a particular diagno-
sis is on the *legal* question of the existence of a "mental
disorder"; the status of the diagnosis among mental
health professionals is only a step on the way to that
ultimate legal determination. The methodology and the
outcome of any mental health evaluation offered as
evidence is a proper subject for cross-examination, and
we would expect that, in the ordinary case, such efforts
would expose the strengths and weaknesses of the profes-
sional medical opinions offered.

No doubt, a medical diagnosis can be based on so
little evidence that bears on the controlling legal criteria
that any reliance upon it would be a violation of due
process. *See Hendricks*, 521 U.S. at 373 (Kennedy, J., concur-
ring) (noting that a constitutional violation may be
found "if it were shown that mental abnormality is too
imprecise a category"). Therefore, a particular diagnosis
may be so devoid of content, or so near-universal in its
rejection by mental health professionals, that a court's
reliance on it to satisfy the "mental disorder" prong of
the statutory requirements for commitment would

violate due process. Whether that point was reached in this case is the question to which we now turn.

**2.**

Both diagnoses at issue are based purportedly on "not otherwise specified," or NOS, diagnoses within the general classes of personality disorders and paraphilias. Perhaps in anticipation of criticism that these categories are too amorphous to provide the kind of standardized, clinical guidance found elsewhere in the text, the DSM provides an explicit explanation of its use of NOS diagnoses. It begins by noting that "the diversity of clinical presentations" makes it "impossible for the diagnostic nomenclature to cover every possible situation." DSM, 4. The introductory note then identifies four specific situations in which an NOS diagnosis may be appropriate. They include situations in which, although the presentation reflects the general guidelines for a diagnostic class, "the symptomatic picture does not meet the criteria for any of the specific disorders. This situation would occur either when the symptoms *are below the diagnostic threshold* for one of the specific disorders or when there is an atypical or mixed presentation." *Id.* (emphasis added). In addition, where a "symptom pattern" is not consistent with a specific DSM classification, but "clinically causes significant distress or impairment," an NOS diagnosis likewise would be appropriate. *Id.*

Mr. McGee is generally critical of the use of NOS categories because, in the view of some professionals, they are "'less of a real diagnostic category than a receptacle

for miscellaneous symptoms.'" Appellant's Br. 11 (quoting Thomas K. Zander, *Civil Commitment Without Psychosis: The Law's Reliance on the Weakest Links in Psychodiagnosis*, 1 J. Sex. Offender Civ. Commitment 17, 67 (2005)); *see also* Brett Trowbridge & Jay Adams, *Sexually Violent Predator Assessment Issues*, 26 Am. J. Forensic Psych. 29, 42 (2008) ("[T]he NOS categories are not diagnostic categories at all but merely catch-all categories for symptoms not listed elsewhere."). He also makes more specific objections. First, he contends that the state court erroneously accepted a diagnosis of personality disorder NOS with antisocial features, as based in the DSM, even though Mr. McGee did not meet the diagnostic criteria for *any* personality disorder or meet the DSM's more specific guidelines for a personality disorder *NOS* diagnosis. Second, he contends that his diagnosis for paraphilia NOS (nonconsent or rape) has been rejected explicitly by the profession and is only accepted by an extreme minority primarily composed of state-employed professionals charged with civil commitment evaluations. We shall address the due process challenges raised in each of these objections.

**a.**

With regard to his personality disorder diagnosis, Mr. McGee makes specific, textual arguments based on the DSM. We therefore begin with a brief explanation of the structure of the text. With each class of disorder, the DSM provides general diagnostic criteria that apply to all of the listed disorders within the class. In the case

of personality disorders, that list includes six criteria, the first of which states that the affected individual exhibits "[a]n enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture." DSM, 689. Another criterion states that this pattern "is stable and of long duration, *and its onset can be traced back at least to adolescence or early adulthood*." *Id.* (emphasis added). After these general guidelines are set forth, the text examines a number of specific disorders within the class. In the discussion of Antisocial Personality Disorder, or APD, (with which Mr. McGee was *not* diagnosed, but which bears the closest relationship to his diagnosis of personality disorder NOS with antisocial features), the first listed diagnostic criterion is "a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years." *Id.* at 706.

In testimony at trial, the experts conceded that there was no evidence demonstrating the onset of an antisocial personality in Mr. McGee's adolescence. R.16, Ex. 83 at 120-21 (Dr. Roberts); *Id.*, Ex. 84 at 35 (Dr. Marsh). It was for that specific reason, according to one expert, that Mr. McGee was given an *NOS* diagnosis with antisocial features, rather than a diagnosis for the specific disorder of APD. Mr. McGee objects that this approach was clinically invalid because it failed to take account of the general diagnostic criteria in the personality disorder class, which *also* require onset in adolescence. Thus, his argument goes, the expert testimony, while cloaked in the authority of the DSM, was, in fact, invalid.

Mr. McGee essentially has asked us to rule that, in order for a diagnosis to be considered as evidence of a mental disorder, mental health professionals applying the DSM must do more than the text itself requires. The introductory materials to the DSM emphasize that:

> [t]he specific diagnostic criteria included in [the] DSM[] are meant to serve as guidelines to be informed by *clinical judgment* and *are not meant to be used in a cookbook fashion*. For example, the exercise of clinical judgment may justify giving a certain diagnosis to an individual *even though the clinical presentation falls just short of meeting the full criteria for the diagnosis* as long as the symptoms that are present are persistent and severe.

DSM, xxxii (emphasis added). The DSM itself thus explicitly contemplates that trained professionals will apply it with informed clinical judgment to reach a conclusion; it cautions that it should "not be applied mechanically by untrained individuals." *Id.*

More fundamentally, however, our task is decidedly different from the professionals who evaluated Mr. McGee, reached a diagnosis and testified at his trial. We must inquire only whether the diagnosis was so patently lacking in credibility and validity that its consideration by the factfinder in the Wisconsin courts resulted in a denial of constitutional rights. Although we acknowledge the variance between some of the clinicians' factual statements and the specific criteria in the DSM, we do not think, given the role assigned to NOS diagnoses in the mental health profession, that the

state court was precluded from considering the personality disorder NOS diagnosis in making its decision that Mr. McGee suffered from a mental disorder that impaired his volitional capacity. The Supreme Court has made it clear that the states have great flexibility in the crafting of a definition of mental impairment. The Wisconsin definition is clearly designed to identify individuals who, unlike the typical recidivist, are unable to exert full volitional control over their violent sexual impulses. The NOS criteria, although not as specific as the delineated categories of established psychiatric diagnosis, can be useful tools, when employed with prudence and caution, in making the *legal determination* as to whether an individual falls within the ambit of the statute.

### b.

The diagnosis for paraphilia NOS (nonconsent or rape), reached only by one of the two clinicians, presents a more complicated picture. Even its most ardent advocates acknowledge that the diagnosis is "probably . . . the most controversial among the commonly diagnosed conditions within the sex offender civil commitment realm." Dennis M. Doren, Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond 63 (2002). The general class of disorders termed "paraphilias" refers to conditions involving "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other

*nonconsenting* persons that occur over a period of at least 6 months." DSM, 566 (emphasis added). Listed paraphilias include exhibitionism, fetishism, frotteurism, pedophilia, sexual masochism, sexual sadism, transvestic fetishism and voyeurism. *Id.* at 566-75. In addition, the DSM includes a category of Paraphilia Not Otherwise Specified, which is explained as the appropriate diagnosis "for Paraphilias that do not meet the criteria for any of the specific categories." *Id.* at 576. The DSM contains a non-exhaustive list of examples: "telephone scatologia (obscene phone calls), necrophilia (corpses), partialism (exclusive focus on part of body), zoophilia (animals), coprophilia (feces), klismaphilia (enemas), and urophilia (urine)." *Id.* at 573. Although the description of sexual sadism includes a reference to rape as a potential subject of fantasies or behaviors associated with the disorder, rape is only consistent with a sadism diagnosis when "it is the suffering of the victim that is sexually arousing" to the person with the disorder. *Id.* Other than this reference (and a companion reference in the description of sexual masochism), rape is not otherwise included in the described Paraphilias or in the exemplary list of NOS Paraphilias.

In preparation for the DSM-III revision, a rape-related paraphilia ("paraphilic rapism") was considered for inclusion. Zander, *supra*, at 45. It was suggested as a distinct diagnosis because, for an afflicted individual, it is "the coercive nature of the sexual act that is sexually exciting, and not signs of . . . suffering of the victim," as is the case in sadism. *Id.* at 46 (citing DSM revision Work Group documents). Significant opposition from interest

groups surrounded the suggestion, and the diagnosis ultimately was rejected for inclusion in the main text of the DSM in 1986. *Id.* At the conclusion of the main text, the DSM sets forth a list of "Other Conditions that May Be a Focus of Clinical Attention," although they are not considered "mental disorders" sufficient to merit inclusion in the main text. DSM, 731. Within *this* listing appears a category called "Sexual Abuse of Adult," which, according to the text, "should be used when the focus of clinical attention is sexual abuse of an adult (e.g., sexual coercion, rape)." *Id.* at 738.

Mr. McGee contends that this rejection by the DSM demonstrates the consensus professional view that a paraphilia NOS (nonconsent or rape) diagnosis is invalid. His contention is not without support in the professional literature.[14] A frequently cited difficulty in accepting a rape-related paraphilia diagnosis is that the lack of

---

[14] *See* Thomas K. Zander, *Civil Commitment Without Psychosis: The Law's Reliance on the Weakest Links in Psychodiagnosis*, 1 J. Sex. Offender Civ. Commitment 17, 41-47 (2005); Holly Miller et al., *Sexually Violent Predator Evaluations: Empirical Evidence, Strategies for Professionals, and Research Directions*, 29 L. & Hum. Behavior 29, 39 (2005) ("Numerous evaluators have utilized the diagnosis 'paraphilia not otherwise specified' to apply to rapists. However, the definition of this appellation is so amorphous that no research has ever been conducted to establish its validity (in fact the word rape is not even mentioned in the Paraphilia NOS diagnostic description)."); Prentky et al., *supra* note 13, at 367 (noting the possibility that the category is "a wastebasket for sex offenders," and thus, "taxonomically useless").

generally accepted standards results in poor diagnostic reliability; that is, different evaluators may be likely to reach different conclusions with respect to the same individual at unacceptably high rates. *See, e.g.*, Trowbridge & Adams, *supra*, at 44 ("NOS diagnoses have the worst levels of inter-rater reliability. . . . [T]he diagnosis of paraphilia NOS had an inter-rater reliability so low . . . that it fell well into the poor category."). The converse view, and the one adopted by one of clinicians in Mr. McGee's proceedings and accepted by the committing court, also has support in the literature.[15]

Given these admittedly conflicting professional views, we must conclude, on the basis of present Supreme Court precedent, that the diagnosis of a paraphilic disorder related to rape is not so unsupported by science that it should be excluded absolutely from consideration by the trier of fact. We reach this conclusion primarily because of the Supreme Court's repeated statements that states must have appropriate room to make practical, common-sense judgments about the evidence presented

---

[15] *See, e.g.*, Dennis M. Doren, Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond 63 (2002); Gregory DeClue, *Paraphilia NOS (Nonconsenting) and Antisocial Personality Disorder*, 34 J. Psychiatry & L. 495, 511-12 (2006); Jack Vognsen & Amy Phenix, *Antisocial Personality Disorder is Not Enough: A Reply to Sreenivasan, Weinberger, and Garrick*, 32 J. Am. Acad. Psychiatry & L. 440, 442 (2004) (contending that forensic experts "must diagnose paraphilia" when an individual suffers more than a personality disorder because of a sexual deviance involving rape).

in commitment proceedings. As Justice Breyer wrote in considering the diagnosis of pedophilia in *Hendricks*, the "presence and vigor" of professional debate on the subject of whether a particular condition qualifies as an illness is important, because "[t]he Constitution permits a State to follow one reasonable professional view, while rejecting another." 521 U.S. at 375 (Breyer, J., dissenting). "The psychiatric debate, therefore, helps to inform the law by setting the bounds of what is reasonable, but it cannot here decide just how States must write their laws within those bounds." *Id.*[16] We are mindful of Justice Kennedy's admonition that if a state's mental health predicate for civil commitment becomes "too imprecise

---

[16] The State of Wisconsin is not alone, among jurisdictions providing for civil commitment, in concluding that a paraphilic rape disorder can be the predicate diagnosis, or one piece of predicate diagnoses. *See, e.g., Brock v. Seling,* 390 F.3d 1088, 1091 (9th Cir. 2004) (per curiam) (denying habeas relief); *In re Detention of Moore*, 216 P.3d 1015, 1019 (Wash. 2009) (en banc); *In re Care and Treatment of Colt*, 211 P.3d 797, 804 (Kan. 2009); *In re Civil Commitment of W.X.C.*, 972 A.2d 462, 466, 467 (N.J. Super. Ct. App. Div. 2009), *certification granted*, 983 A.2d 201 (N.J. 2009); *In re A.M.*, 766 N.W.2d 437, 441 (N.D. 2009); *In re Detention of Hardin*, 907 N.E.2d 914, 917, 922 (Ill. App. Ct. 2009) (reversing the trial court's determination that a petition for commitment based in part on a diagnosis of paraphilia NOS-nonconsent did not demonstrate probable cause), *appeal allowed*, ___ N.E.2d ___, 233 Ill.2d 558 (Ill. Sept. 30, 2009); *In re R.Y., Jr.*, 957 A.2d 780, 782, 786 (Pa. Super. Ct. 2008); *Dunivan v. State*, 247 S.W.3d 77, 78 (Mo. Ct. App. 2008); *State v. Shaw*, 929 So.2d 1145, 1147-48 (Fla. Dt. Ct. App. 2006); *People v. Williams*, 74 P.3d 779, 781-82 (Cal. 2003).

a category," it may run afoul of the Constitution. *Id.* at 373 (Kennedy, J., concurring). The existence of a heated professional debate over a particular diagnosis does not indicate that such a line has been crossed here.

The professional objections to the diagnosis of paraphilia NOS (nonconsent or rape) are not without persuasive value. The existence of the debate is a relevant issue in commitment proceedings and a proper considera-tion for the factfinder in weighing the evidence that the defendant has the "mental disorder" required by statute. Given the present state of Supreme Court precedent, however, we cannot conclude that the diagnosis of a rape-related paraphilia is so empty of scientific pedigree or so near-universal in its rejection by the mental health profession that civil commitment cannot be upheld as constitutional when this diagnosis serves as a predicate.


## Conclusion

The primary due process concern of the Supreme Court in the area of civil commitment is the necessity of distinguishing between the typical dangerous recidivist and the offender whose dangerousness is caused by some identifiable mental condition that impairs his ability to refrain from activity dangerous to others. The Wisconsin SVP statute, by its very language, accomplishes this result. Limited to the sexually dangerous, it narrows the class of offender eligible for commitment by requiring a judicial determination that a mental condition impairs the offender's ability to refrain from sexually dangerous activity. In Mr. McGee's case, the Wisconsin committing

court found that Mr. McGee's admitted sexual danger-ousness was caused by a mental condition. In reaching that conclusion, it relied upon the assessments of two mental health professionals who concluded that Mr. McGee was afflicted with conditions that satisfied the Wisconsin legal criteria for a "mental disorder." These diagnoses, which were constitutionally adequate under existing Supreme Court precedent, and the evidence upon which the diagnoses were based, afforded the Wisconsin committing court an adequate basis, under the Due Process Clause, to order his commitment.

Accordingly, the judgment of the district court denying the writ of habeas corpus must be affirmed.

AFFIRMED