Sixth Division
May 28, 2010

No. 1-09-0796

| | | |
|---|---|---|
| *In re* DETENTION OF BRAD LIEBERMAN | ) | Appeal from |
| | ) | the Circuit Court |
| (The People of the State of Illinois, | ) | of Cook County |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | 00 CR 80001 |
| | ) | |
| Brad Lieberman, | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Dennis J. Porter, |
| | ) | Judge Presiding |

JUSTICE McBRIDE delivered the opinion of the court:

In these proceedings under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq*. (West 2008)), respondent, Brad Lieberman, appeals from an order of the circuit court of Cook County denying his petition for discharge or immediate release from the care and custody of the Illinois Department of Human Services (DHS).  On appeal, respondent contends that the denial of his petition was an abuse of discretion and violated his right to due process of law.  For the reasons that follow, we affirm.

In 1980, respondent was convicted of multiple counts of rape and sentenced to a number of concurrent terms of imprisonment, the longest of which required him to serve 40 years in prison.  Immediately prior to his release from the Illinois Department of Corrections (IDOC) in 2000, the State filed a petition pursuant to the Act seeking to have respondent adjudicated a sexually violent person and committed to the care and custody of the DHS[1].  In 2006, a jury

---

[1]The Act defines a sexually violent person as an individual who "has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence."  725 ILCS 207/5(f) (West 1998).

found respondent to be a sexually violent person under the Act based primarily upon the expert testimony of two clinical psychologists who diagnosed respondent with paraphilia not otherwise specified, sexually attracted to nonconsenting persons (paraphilia NOS, nonconsent), a congenital or acquired disorder that affects respondent's emotional or volitional capacity and predisposes him to commit future acts of sexual violence. The expert witnesses also concluded that respondent's mental disorders created a substantial probability that he would engage in future acts of sexual violence if released. Following a subsequent dispositional hearing, the trial court ordered respondent committed to the DHS for institutional care in a secure facility until further order of the court. This court affirmed that judgment on direct appeal. See *In re Detention of Lieberman*, 379 Ill. App. 3d 585 (2007).

On October 29, 2007, the State filed a motion in the circuit court of Cook County asking the court to find that there was no probable cause to believe that respondent was no longer a sexually violent person and to order that respondent remain in a secure facility. Attached to the State's motion was the October 19, 2007, report of licensed clinical psychologist Dr. David Suire. Dr. Suire's report was based upon previous psychological assessments, records from the DHS treatment and detention facility where respondent was being detained, records from the IDOC, court records, and risk assessment tools. According to Dr. Suire's report, respondent refused to participate in a clinical interview for purposes of his annual reexamination. The doctor's report also noted that respondent had maintained his innocence as to all the sexual offenses with which he had been charged or convicted and had refused to participate in any formal sexual offender treatment program while in the IDOC and while in the DHS treatment and

2

detention facility. In his report, Dr. Suire stated that, to a reasonable degree of psychological certainty, respondent met the diagnostic criteria under the Diagnostic and Statistical Manual of Mental Disorders (DSM) for the following diagnoses: (1) paraphilia NOS, nonconsenting females; (2) cannabis abuse; (3) antisocial personality disorder; and (4) narcissistic personality disorder. Dr. Suire concluded that, in his professional opinion and to a reasonable degree of psychological certainty, it was substantially probable that respondent would engage in acts of sexual violence in the future. He therefore recommended that respondent continue to be found a sexually violent person and remain committed to the DHS treatment and detention facility for further secure care and sexual offender treatment until he demonstrated that he had made substantial progress in sexual offense treatment to be safely managed in the community on conditional release. Based upon Dr. Suire's report, the State maintained that there was no probable cause to warrant a full hearing on whether respondent should be conditionally released or discharged and asked the court to enter an order continuing respondent's confinement.

On July 15, 2008, respondent filed a petition for release from the custody of the DHS. Respondent claimed that he lacked the requisite mental abnormality to be confined in the DHS facility and that his mental health since the time of his civil commitment demonstrated that he was entitled to immediate discharge. Respondent sought two alternative forms of relief: (1) immediate discharge pursuant to section 65 of the Act (725 ILCS 207/65 (West 2008)), on the ground that he does not suffer from a mental abnormality that causes him to be a threat to others and that it was not substantially probable that he would engage in future acts of sexual violence; and (2) conditional release pursuant to section 60 of the Act (725 ILCS 207/60 (West 2008)), on

3

the ground that he had made substantial progress since the time of his initial commitment.

The trial court appointed Dr. Eric Ostrov to conduct an independent examination of respondent and granted respondent's request for an examination by Dr. Chester Schmidt. Both experts prepared reports that were submitted to the court. On September 17, 2008, the trial court held a hearing to determine whether there was probable cause to believe that respondent was no longer a sexually violent person or that it was not substantially probable that respondent would engage in future acts of sexual violence if released. The first witness to testify at the hearing was defendant's expert, Dr. Schmidt.

Dr. Schmidt described himself as a "physician psychiatrist," a professor of psychiatry at Johns Hopkins University School of Medicine, and a founder and member of the sexual behavior consultation unit at Johns Hopkins Hospital. In 1995, he was appointed chairman of a work group for psychosexual disorders and paraphilias, and that group was one of a number of groups charged with revision of the DSM-III-R to the current DSM-IV. At that same time, Dr. Schmidt was a member of the American Psychiatric Association's (APA) board of trustees and he participated in the vote to approve his committee's recommendation regarding inclusion of the diagnosis of paraphilia NOS, nonconsent in the DSM.

In preparation for his work in this case, Dr. Schmidt reviewed, among other things, articles on civil commitment and the diagnosis of paraphilia NOS, the transcript from respondent's 2006 sexually violent person trial, police reports, IDOC mental health reports, respondent's DHS master treatment plans, and expert reports from Dr. Jacqueline Buck, Dr.

4

1-09-0796

Barry Leavitt, Dr. Suire, and Dr. Ostrov.[2]  He also interviewed respondent for approximately two hours on April 6, 2008.

Dr. Schmidt rendered two opinions following his review of this information.  First, that the diagnosis of paraphilia NOS, nonconsent does not exist in the DSM-IV.  Second, that respondent does not have a disorder known as a paraphilia.

As to his first opinion, Dr. Schmidt explained that the DSM-IV contains a disorder called paraphilia not otherwise specified and that this section provides examples, such as necrophilia and zoophilia.[3]  However, the disorder of paraphilia NOS, nonconsent is not contained within this section.  The doctor further explained that in another section, the DSM states that the central diagnostic features of paraphilia include "recurrent, intense, sexually arousing fantasies, sexual urges or behaviors generally involving *** nonconsenting persons."  Paraphilia NOS, however, cannot be combined with the diagnostic feature of "nonconsenting persons" in order to conclude that the DSM contains a disorder called paraphilia NOS, nonconsent.  There is a formal process by which diagnoses are included in the DSM and that process has not taken place with paraphilia NOS, nonconsent.  Moreover, a mental health professional cannot create a diagnosis based on his or her own personal interpretation of the DSM.  Rather, the use of only officially recognized

---

[2]Dr. Buck and Dr. Leavitt were the State's expert witnesses at the 2006 trial to determine whether respondent was a sexually violent person.

[3]Necrophilia is defined as an "obsession with and usually erotic interest in or stimulation by corpses," while zoophilia is defined as "an erotic fixation on animals that may result in sexual excitement through real or fancied contact."  Meriam-Webster Medical Dictionary (2010), available at http://www.merriam-webster.com/medlineplus/necrophilia; http://www.merriam-webster.com/medlineplus/zoophilila.

diagnoses is essential for purposes of treatment, research, and the "integrity of the legal system itself." Further, rape is specifically dealt with in other sections of the DSM. Rapes that contain a paraphilic element are covered in the paraphilia section of the DSM on sexual sadism, which lists rape as a behavior sometimes associated with sadistic behavior. Rapes that do not contain a paraphilic element are found in a section called "other conditions that may be the focus of clinical attention." The conditions and behaviors in this section are "of interest to mental health professionals" but "do not rise to the threshold of being mental illnesses in and of themselves." This section of the DSM contains "V-codes," and the contingency of rape with no paraphilic element is covered in the section of V-codes entitled "sexual abuse of adults."

In 1986, Dr. Schmidt was the chairmen of a committee that was convened by the APA to consider whether the disorder of paraphilia NOS, nonconsent should be included in the DSM-III. The committee voted against recommending inclusion of that diagnosis in the DSM for two reasons. First, there was "no scientific support for the diagnosis" but instead only "expert opinion[,] which is one of the lowest forms of research to support anything." Second, various organizations raised the concern that including the diagnosis in the DSM could be misused as an insanity defense in rape trials. The committee's recommendation was submitted to the APA board of trustees, of which Dr. Schmidt was also a member, and the board voted to not include the diagnosis in the DSM-III-R. During his later work from 1995 to 2000 on the revision of the DSM-III-R to the DSM-IV, there were no requests that the disorder be included in that edition of the DSM. To Dr. Schmidt's knowledge, there is no current reconsideration of this decision, which meant that "the field in general is essentially satisfied with the *** diagnostic format that

exists within the DSM-IV."

Dr. Schmidt's second opinion was that respondent does not suffer from any type of paraphilia.[4] Dr. Schmidt reviewed the 15 evaluations of respondent conducted during the 20 years he was in the IDOC, none of which diagnosed respondent with any type of paraphilia. Dr. Schmidt testified that the mental health professionals who evaluated respondent would have been required to indicate any such diagnosis on their evaluation forms and that it was "hard to believe that any mental health professional worth his or her salt given the circumstances that he was in jail for raping" would not have found paraphilia if it in fact existed.

Dr. Schmidt also stated that respondent's psychosexual history "up to the time of the 1979 crimes" did not reveal paraphilic urges or behaviors but, rather, "a fairly normal heterosexual development during" his adolescent years. Moreover, based upon respondent's self-reported information, Dr. Schmidt saw no evidence of recurrent paraphilic urges or fantasies. With respect to paraphilic behavior, there were no reported behaviors of any coercive sexual activity with either female staff or prisoners. If respondent had paraphilia, it would be expected that he would have found an outlet to act out that paraphilia, including within the prison's homosexual community. This would be true even though respondent was otherwise a heterosexual.

Dr. Schmidt also believed that respondent's symptom severity and functional capacity

---

[4]Paraphilia is defined as "a pattern of recurring sexually arousing mental imagery or behavior that involves unusual and especially socially unacceptable sexual practices (as sadism, masochism, fetishism, or pedophilia)." Meriam-Webster Medical Dictionary (2010), available at http://www.merriam-webster.com/medlineplus/paraphilia.

since he entered the DHS treatment and detention facility in 2000 did not indicate that he suffered from paraphilia NOS, nonconsent. Specifically, Global Assessment of Functioning (GAF) scores, which are determined by the DHS treatment team and which can range from 1 (worst) to 100 (best), are a measure of a person's symptom severity and level of functioning. Dr. Schmidt testified that respondent's current GAF score indicates that his symptom severity and functional capacity are "pretty close to normal at this time." According to Dr. Schmidt, respondent's GAF scores from 1999 to 2005 were in the area of 45, which indicates serious symptoms or impairment. During his three most recent reviews, respondent's treatment team gave him a GAF score of 71. This score indicates that symptoms are present but are "transient and expectable reactions to psycho-social stressors" and that respondent has "no more than slight impairment in social, occupational, or school functioning." Ultimately, assuming that respondent suffered from a paraphilia when he was given that diagnosis in 1999 or 2000, the upward trending of his GAF score indicated to Dr. Schmidt that those who have observed respondent believe that he has dramatically improved in terms of symptom severity and functional capacity.

Dr. Schmidt explained that respondent having committed multiple rapes did not establish that he had a mental disorder. First, rape is not in itself a mental disorder or necessarily paraphilic, and only a small fraction of rapists suffer from paraphilia. Second, Dr. Schmidt believed that respondent's pre-rape history may be relevant to explaining respondent's commission of multiple rapes. According to the materials Dr. Schmidt reviewed, respondent reported that, as a teenager, he had a sexual experience in which a woman that he was attempting to have intercourse with "initially resisted, resisted, and then allowed, then said yes."

8

Respondent indicated that this was "a very important experience" because as a result he believed at the time that "when women say no they really meant yes." Respondent also reported that his first rape was very sexually gratifying. According to Dr. Schmidt, at that time respondent was acting selfishly for his own sexual gratification and had no regard for the law. When respondent was apprehended and then released on bond, he committed additional rapes because he thought that "the law had no teeth" and that he "was immune from the law." Dr. Schmidt opined that these experiences provide "as plausible an explanation as maybe we'll ever get from the facts of the case."

On cross-examination, Dr. Schmidt testified that he has never been a member of any professional organization whose focus is the evaluation and treatment of sexual offenders and that, prior to respondent's case, he had never been qualified as an expert in a sexually violent persons case or in the evaluation of sexual offenders. Other than respondent, Dr. Schmidt has never evaluated a person who has been found to be a sexually violent person by the laws of any state. The doctor testified, however, that he has evaluated people who are convicted sexual offenders and who have been charged with sexual offenses. Dr. Schmidt testified that he did not review the original police reports or the transcripts from the trials resulting in respondent's rape convictions. He also acknowledged that he did not speak to any of the treating staff at the DHS facility where respondent has been detained and that the only DHS information he reviewed was that provided by respondent's counsel. Dr. Schmidt testified that he did not "know anything" about commitment laws for sexually violent persons until the present case and that he therefore had no personal opinion of them.

Dr. Schmidt further testified under cross-examination that there has been an ongoing debate in the psychiatric field over the last 20 years as to the validity of the diagnosis of paraphilia NOS, nonconsent. Dr. Schmidt believed that paraphilia NOS, nonconsent is not a valid disorder despite reports suggesting that there is "apparent widespread acceptance" of the diagnosis "by forensic experts in the field." When asked if every diagnosis in the DSM is universally accepted by every clinic that uses the DSM, Dr. Schmidt responded that "all of us have some objections or fault with diagnoses, but the diagnoses are universally used by the medical insurance industry and are strictly required to be used for reimbursement, if for no other reason, not to mention science." They are also used for diagnosis, for managing patients, and for research. "It is absolutely essential that there be a consensus with regard to the diagnosis, irrespective of any difficulties or problems any professional has with any aspect of the DSM-IV."

Respondent testified on his own behalf that since he has been committed to the custody of the DHS, he has married, founded a "facility band," taken computer classes, obtained an Occuptional Safety and Health Administration (OSHA) certification, and participated in the "institutional newsletter." Respondent also testified that residents at the DHS detention facility are assigned to various status levels based upon their behavior and that, like most others, he began in "admission status." For the last several years, he has been in "intermediate A status," which is the "highest status attainable." In order to attain that status, respondent was required to comply with the institutional rules and to be involved in the "responsible living program," which requires completion of certain tasks and jobs in order to "demonstrate that you are able to accept

responsibility and eventually reintegrate yourself into the community."

Respondent testified that since his commitment he has refused to participate in the DHS treatment and detention facility's formal sexual offender treatment program. Participation in the program requires admission that a person lacks volitional control and, according to respondent, "I don't lack control of myself." Respondent also has not participated in formal treatment because he does not want to listen to fellow detainees describe the crimes they have committed. Respondent testified that, "I don't need [therapists] to tell me how to think," and that he "knows what is right and what is wrong." Respondent has, however, spoken openly to his primary therapist at the detention center.

Respondent further testified that he has been in physical proximity to women in the detention center, including therapists, but that he has not had any behavioral incidents. According to respondent, if he was conditionally released, he would live with his wife and that an attorney has offered him employment in a law firm. Respondent also indicated that if released, he would participate in drug and alcohol testing as well as counseling or therapy.

On cross-examination, respondent testified that until recently he had denied committing the rapes of which he was convicted. In early 2008, Dr. Eric Ostrov was appointed by the court to evaluate respondent and at that time respondent admitted that he was in fact guilty of those crimes. Respondent testified, however, that it was "not exactly" true that he had been denying his guilt for the past 28 years. He explained that in 1983, "Judge Berkos" took respondent, respondent's father, a public defender and a prosecutor into his chambers and told respondent that if he lied to the judge he would never "see the light of day again." Respondent then took

responsibility for his crimes and his subsequent denials were based in part on "strategic advice" from his attorneys. Respondent further explained that he admitted his guilt to Dr. Ostrov because after his 2006 sexually violent person trial, he "didn't have any rights that had to be protected." Respondent concluded by testifying that he has taken responsibility for his actions and learned from his mistakes and that he is not the same person today that he was at the age of 19 and 20 when he committed the rapes.

The parties stipulated that if called as a witness, Dr. Mark Babula would testify that he was respondent's primary therapist at the DHS treatment facility and that any contact he had with respondent did not constitute sexual offender treatment. Dr. Babula would further testify that respondent has not participated in sexual offender treatment at the DHS treatment and detention facility. In a 2008 deposition, Dr. Babula testified that respondent's GAF score is determined by his DHS treatment team using the DSM's GAF criteria and procedures.

The State's first witness was Dr. Ostrov, who had been appointed by the court to evaluate respondent. Dr. Ostrov testified that he is a psychologist with a focus on forensic psychology. Dr. Ostrov received a Ph.D in clinical psychology and a J.D. from the University of Chicago and is board certified by the American Board of Professional Psychology. Dr. Ostrov is also on the Illinois Sex Offender Management Board approved list of evaluators. Since the sexually violent persons (SVP) law was passed in 1998, Dr. Ostrov has conducted over 100 evaluations of approximately 40 people who were accused of being sexually violent persons pursuant to court order. Dr. Ostrov had previously been qualified as an expert in psychology and in the evaluation of sexual offenders. The trial court qualified Dr. Ostrov as an expert in these areas.

Dr. Ostrov diagnosed respondent, within a reasonable degree of psychological certainty, with paraphilia NOS, nonconsent, and he therefore did not recommend that respondent be conditionally released. Dr. Ostrov also testified that he did not diagnose respondent with "cannabis abuse in a controlled environment." In the doctor's opinion, however, within a reasonable degree of psychological certainty, respondent did suffer from a personality disorder with antisocial and narcissistic features. These disorders, including paraphilia, predispose respondent to commit future acts of sexual violence. In arriving at this conclusion, the doctor reviewed portions of respondent's IDOC master file, reports from other mental health professionals such as Dr. Buck, Dr. Leavitt, and Dr. Linton, and police records from respondent's past crimes. Dr. Ostrov also met with respondent three times at the DHS treatment and detention facility.

Dr. Ostrov testified that he used the DSM when he evaluated respondent and that, under certain circumstances, paraphilia NOS, nonconsent is an appropriate diagnosis. Dr. Ostrov was aware that some experts believe that the diagnosis is inappropriate because it is not specifically enumerated in the DSM's examples of paraphilia NOS, and because of concerns that it could be used to exculpate rapists. However, Dr. Ostrov did not agree with the principle that if a diagnosis is not contained in the DSM it is not a widely recognized diagnosis. For example, the word "psychopath" is not found in the DSM, yet it is widely recognized among mental health professionals. Moreover, the examples given in the DSM of paraphilia NOS are "simply examples" that are "not meant to be exhaustive." Dr. Ostrov believed that "nonconsenting per se" is not listed as an example under the paraphilia NOS category due to the concern that it could

13

be used to exculpate a rapist. Dr. Ostrov further explained that the DSM is a standard reference work for mental health professionals so they have a common reference point when they use terminology in the mental health field. The DSM is a way for mental health professionals to communicate with each other and a means to guide diagnosis, which in turn is a way to guide treatment. Dr. Ostrov acknowledged that not all rapists have a paraphilia but this did not mean that "there are not other persons who have sex with nonconsenting persons who do have a paraphilia." Dr. Ostrov also did not agree with the notion that a diagnosis of paraphilia NOS, nonconsent should not be given because it could be used to exculpate rapists. According to the doctor, "there are persons who are criminals who commit rapes, and there are persons who commit rapes who have a mental disorder."

Dr. Ostrov further testified that the DSM contains guidance for a diagnosis of paraphilia NOS, nonconsent. The DSM states that the person must have "recurrent and intense" sexually arousing fantasies, sexual urges, or behaviors. The DSM then gives examples of the objects of these fantasies, urges or behaviors, including "children or other nonconsenting persons." The DSM provides additional criteria, such as a recurrence of the fantasies, urges or behaviors over a period of six months, an age requirement, and a requirement that it "has to have caused clinically significant distress or impairment in social, occupational, or other important areas of functioning."

Dr. Ostrov's paraphilia diagnosis was informed by several aspects of respondent's behavior. According to Dr. Ostrov, the police reports, convictions, and respondent's own testimony showed "repeated instances of non-consensual sex directed to different women over a

14

period of time longer than six months. Moreover, these instances of nonconsensual sex caused respondent clinically significant distress or impairment in that they "caused him enormous impairment in social and occupational and other areas of functioning." Further, respondent was over 16 years old at the time of the rapes and his victims were not children. Respondent therefore met the criteria for paraphilia NOS, nonconsent.

Dr. Ostrov's paraphilia diagnosis was also informed by what he referred to as respondent's "drivenness." He explained that this involved the distinction between someone who commits rapes and either does or does not suffer from a paraphilia. In respondent's case, raping women was the goal "in and of itself." Respondent's rapes were not opportunistic as in the case of a burglar, for example, who enters a home, finds a women there, and as a criminal takes advantage of that opportunity by committing a rape. Respondent's case is different in that his goal was not to obtain money or drugs but, rather, to obtain sex. In other words, it "was a specifically sexually-driven act repeated over and over and over again, and, in fact, repeated even after he was apprehended *** and had spent time in jail for it." Respondent also struck one victim who would not cooperate and this demonstrated to Dr. Ostrov that the rape was not simply an opportunity that respondent took but, rather, something that he had to do and that he would make her do by hitting her if she did not cooperate.

With respect to whether respondent's behavior might have been driven by fantasies, Dr. Ostrov gave an example of one of the first woman that respondent raped. In his interview with the doctor, respondent explained that he met the woman at a party and began to have nonconsensual sex with her until it became consensual. Respondent told Dr. Ostrov that he

understood the woman had been raped before and "may have been cooperating out of fear and giving the illusion that she was cooperating." However, in one of the tests Dr. Ostrov administered, respondent explained it "in a completely different way" by stating that "she was into it, she wanted it, that she kept it going, she changed positions, and that that had an effect on him that she was so into it in terms of leading [him] to commit further rapes." This gave the doctor the clinical impression of a fantasy because from the police reports and what respondent told him in the interview, "there is no way that she was into it, or she was enjoying it, or she was changing positions to prolong it."

Dr. Ostrov did not believe respondent's position that he committed the rapes "because he was basically young, ignorant, stupid *** and really didn't understand the repercussions of his behavior." The police reports revealed that respondent was often very concerned about being apprehended. Thus, respondent's actions were not simply "youthful caprice" but more akin to "driven behavior" in that "despite his fear, the drivenness overcame that fear" and led him to commit rapes anyway.

Dr. Ostrov disagreed that respondent has taken full responsibility for his past actions. For example, when respondent was asked how his potential release might affect his victims, he answered in a "cavalier" manner that, to his knowledge, none of the victims remained in the area. This response showed a lack of empathy toward his victims because it failed to address that his victims would almost certainly be concerned about his release, regardless of where they currently lived, and because some of those victims might have family members still living in the area.

In arriving at his opinions, Dr. Ostrov also considered respondent's statements that he has

16

been on good behavior and has not engaged in nonconsensual intercourse while detained in the IDOC and the DHS treatment and detention facility. According to Dr. Ostrov, some people act out in prison and some do not. In the case of those who do not, this may be because the person has changed or it may be because that person does not "have the opportunity to commit the crime they are predisposed to commit." In respondent's case, there is no past instance of him having interest in men so his access to other prisoners was not relevant. Moreover, although respondent claimed to have access to women while he has been detained, it was "certainly not the kind of access he had when he was out in the community" because "there was always some level of surveillance." Dr. Ostrov further explained that respondent's claim that he has not "acted out sexually" while he has been detained must be viewed in context of the fact that he has not been around his preferred sexual stimuli. People with a paraphilia act much differently when they are aroused by being in contact with their preferred sexual stimuli than they do when that stimuli is not available. When someone with paraphilia is aroused, his ability to control himself and to consider the consequences of his actions is "markedly" decreased.

Dr. Ostrov also administered an actuarial called the "Static-99," and respondent's score indicated that he posed a high risk of reoffending. Dr. Ostrov further believed respondent was at a high risk of reoffending because he has not shown an interest in participating in formal sexual offender treatment and because he has not had the benefit of completing that treatment, which has been empirically shown to decrease the risk that a person will sexually reoffend. Dr. Ostrov considered respondent's statement that he did not attend therapy because he did not want to listen to the stories of other sexual offenders. However, one aspect of treatment is taking responsibility

for your actions and if respondent is not willing to listen to others discuss their past crimes, Dr. Ostrov questioned how respondent could reflect on the crimes he has committed.

Dr. Ostrov acknowledged that respondent's age (48 years old) would have some impact on his likelihood of recidivism but "not a very significant impact" because the likelihood of recidivism "doesn't reach a very significant level of decrease until about age 60." The likelihood of recidivism does decrease as a person approaches 50 years old, however, and therefore respondent posed a "moderately severe risk," rather than a severe risk, of committing a future act of sexual violence. Dr. Ostrov characterized this as an "appreciable risk" such that he did not believe respondent was an appropriate candidate for conditional release. According to Dr. Ostrov, the question is whether respondent has decreased that risk to the point that it would be tolerable for him to be on conditional release and, other than respondent's age and the fact that he has not acted out sexually while incarcerated or detained, Dr. Ostrov did not see evidence that respondent has significantly decreased the risk that he would sexually reoffend.

On cross-examination, Dr. Ostrov testified that he has served on a formal body that decided which disorders belonged in the DSM, although neither the APA nor its board of trustees has vested him with the authority to revise the DSM. Dr. Ostrov acknowledged that the Static-99 does not account for the risk-reducing factors of age after 25 years old and maturity and that respondent's participation in the facility newspaper, his "Intermediate-A" status, and his attainment of an OSHA certification are, "to some extent," evidence of risk-reducing maturity. Dr. Ostrov also acknowledged that respondent has married, has taken classes, and has a job waiting for him, but the doctor did not believe these facts were "dispositive" because respondent

18

"has not addressed in any formal manner his paraphilia or his personality disorder." The doctor testified that he found no evidence that respondent currently has sexually arousing fantasies or urges involving nonconsenting persons. Dr. Ostrov also testified that respondent's paraphilia is not severe "in the environment he is in," and he explained that "the critical words in there [are] 'in the environment he is in.'" The doctor further testified that he was "not sure what a moderate or mild [paraphilia] would be" because "a paraphilia itself is severe." Finally, Dr. Ostrov acknowledged that he could not tell whether there is more or less than a 50% likelihood that respondent would reoffend if he was conditionally released.

The State's next witness was Dr. Suire, who performs evaluations relating to sexually violent person commitments for the DHS. Dr. Suire is a licensed clinical psychologist and has worked in the past at the Wisconsin sexually violent person facility, at a Texas state mental health facility where he performed evaluations relating to competency to stand trial, and as clinical director of the Missouri Sexual Offender Program. The doctor has performed approximately 120 evaluations in Illinois pursuant to the Act. In the past, the doctor has been qualified as an expert in SVP evaluations in Wisconsin, Illinois and Missouri. The trial court found Dr. Suire to be an expert in the field of psychology with a speciality in the area of sexual offender evaluations.

Dr. Suire evaluated respondent in 2007 and prepared a report pursuant to the Act. As part of his evaluation, Dr. Suire reviewed records from the IDOC and the DHS treatment and detention facility, police reports, court records, and prior psychological reports of respondent's mental condition, including those of Dr. Levitt and Dr. Buck. These are documents that experts

in Dr. Suire's field reasonably reply upon. Dr. Suire attempted to conduct a clinical interview of respondent at the DHS treatment and detention facility, but respondent refused to be interviewed. Dr. Suire stated that over half of the people that he has evaluated have refused to be interviewed and that in those situations his report is based primarily upon written records.

Dr. Suire diagnosed respondent, to a reasonable degree of psychological certainty, with "paraphilia not otherwise specified, sexually attracted to nonconsenting person nonexclusive," cannabis abuse, antisocial personality disorder, and narcissistic personality disorder. Dr. Suire used the DSM to arrive at these diagnoses and he explained how the DSM is used to diagnose paraphilia NOS, nonconsent. Dr. Suire explained that for a paraphilia to be present, a person must have recurrent severe urges, fantasies, or behaviors related toward certain types of sexual actions or contact. This could include urges, fantasies or behaviors for sexual conduct with inanimate objects, children, or other nonconsenting persons. Some paraphilias have a specific diagnostic code within the DSM, such as exhibitionists, and if there is not a specific code, the diagnosis is made under paraphilia not otherwise specified. Additional more specific coding information is then provided by the DSM. Thus, for the example of obscene phone calls, the diagnosis would be "paraphilia NOS telephone scatologia." In the case of "what is sometimes called paraphilic rape, the commonly used diagnosis would be paraphilia NOS nonconsenting."

Dr. Suire testified that respondent met all of the diagnostic criteria for this diagnosis. He committed or attempted to commit a large number of rapes within a 10-month period, which satisfied the 6-month requirement and spoke to the intensity of respondent's urges. Because respondent refused to be interviewed, Dr. Suire could not speak to respondent's fantasy life.

However, the doctor stated that "its difficult for me to imagine that you can have this type of pattern without having fantasies attached to it." Finally, the fact that respondent has spent most of his adult life either in prison or a secure commitment facility spoke to the difficulty his urges, fantasies or behaviors have caused him.

Dr. Suire also considered the nature of the rapes that respondent committed and the fact that he posed as a plumber to gain access to his victims. The doctor explained that not all rapes are due to paraphilic urges and therefore it is important to determine if the driving force behind the rape-type behavior is an underlying specific urge toward nonconsenting sexual contact. In making this determination, considerations include the use of a kind of "stereotype repetitious pattern," whether the rape-type behaviors were occurring while the person had access to consenting sexual partners, the frequency of the acts of sexual misconduct, and whether the person was committing other crimes while committing rapes.

Dr. Suire testified that he was aware of the disagreement regarding the diagnosis of paraphilia NOS, nonconsent, but that this did not prevent him from diagnosing respondent with the disorder. He stated that "there is probably nothing in the field of psychology that doesn't have some degree of disagreement." The disagreement over the disorder is primarily due to "political factors" and the general belief that not all rapists have a paraphilia.

Dr. Suire also performed a risk assessment as part of his evaluation of respondent. The first part of the assessment consisted of file review, information gathering, and his attempt to interview respondent. The second step involved the use of actuarial instruments to attain a "baseline estimate of the risk." In this case, Dr. Suire used the Static-99 and the Minnesota Sex

Offender Screening Tool Revised (MNSOST-R), both of which are well-accepted actuarials. Respondent scored in the "high-risk" on the Static-99 and in the "refer risk" range on the MNSOST-R. The "refer risk" range is a higher risk level than the "high-risk" range, although Dr. Suire noted that there were questions about one of the items and that respondent might therefore be in the high-risk range. The final step in performing a risk assessment involved consideration of "aggravated" and "protective" factors, which can increase or decrease a risk level above or below that as indicated by the actuaries. Respondent had a "fairly large number" of aggravating factors, including deviant sexual arousal, two personality disorders, a high score on the "Harris psychopathy checklist, which, while not a specific predictor of sexual offense recidivism, is correlated with an elevated risk," and a high score on the violence risk assessment guide, which also correlates with an elevated risk. The three main protective factors Dr. Suire considered were treatment progress, medical condition, and age. Respondent did not have any medical conditions that were of any relevance to his risk of committing a sexual offense. Age is negatively correlated with the risk of sexual recidivism but, with respect to high-risk offenders such as respondent, Dr. Suire did not think that "we are at the point where we can say that with any level of confidence." Therefore, the doctor did not consider respondent's age to be a significant protective factor. Finally, respondent has never participated in core sexual offender treatment, which can "substantially reduce the risk of sexually reoffending." Dr. Suire did not believe that this risk was reduced by respondent's participating in "ancillary treatment-type" programs at the DHS treatment and detention facility.

Based upon his consideration of all these factors, Dr. Suire opined that, to a reasonable

degree of psychological certainty, it is substantially probable that respondent will commit new acts of sexual violence, that he remains a sexually violent person, and that he has not made sufficient progress to allow him to be safely managed in the community.

On cross-examination, Dr. Suire testified that the APA has never vested him with the authority to revise the DSM. Dr. Suire acknowledged that he did not know what respondent's present sexual fantasies or urges are and that he had no evidence "other than the facts of the 1979, 1980 behaviors" to support his paraphilia diagnosis. However, Dr. Suire testified that he did not think "any additional evidence is needed." Finally, Dr. Suire acknowledged that he was between 51% and 100% certain of his paraphilia diagnosis and he explained that "I don't know that we ever in psychology rise to a level of one hundred percent certainty."

Following closing arguments, the trial court denied respondent's petition and found that there was not probable cause to warrant a trial on the issues of whether respondent remained a sexually violent person or whether it was not substantially probable that respondent would engage in acts of sexual violence if released. The trial court acknowledged disagreement among mental health professionals as to the validity of the diagnosis of paraphilia NOS, nonconsent and stated that the question could not be answered simply by testimony that the disorder is not specifically listed in the DSM. The court then commented on the credibility of the witnesses, noting that Dr. Schmidt had "impressive credentials," but that there was something "very troubling about his testimony and his evaluation of sexually violent persons, which this is the first, apparently, he's done." The court noted that Dr. Schmidt's explanation as to why respondent committed multiple rapes if he did not suffer from a mental disorder, specifically his

23

testimony regarding respondent having had intercourse at a young age with a girl who initially told him no and that having led him to believe that no meant yes, "was absolutely, totally, completely absurd, quite frankly." On the other hand, the court stated that Dr. Suire and Dr. Ostrov were "quite credible" witnesses. The court found that the diagnosis of paraphilia NOS, nonconsent was a mental disorder that satisfied the requirements of the Act. The court further noted that although it was "not impressed with the credibility of [respondent's] testimony," the evidence did show that respondent had made "an improvement to some extent." However, the court observed that respondent had refused to participate in formal sexual offender treatment, claiming he did not need it, and that "when you add that to the whole mix of what I observed," respondent had not made sufficient progress to be conditionally released or discharged. Therefore, the court found that there was not probable cause to hold a further evidentiary hearing on respondent's petition. This appeal followed.

Prior to considering respondent's contentions on appeal, it is necessary to review the provisions of the Act that are at issue in this case. After a person has been committed to institutional care, the Act requires the DHS to conduct an examination of that person's mental condition within 6 months of the initial confinement and again thereafter at least every 12 months. The purpose of the reexamination is to determine whether the person has made sufficient progress to be conditionally released or discharged. See 725 ILCS 207/55(a) (West 2008). At the time of each reexamination, the committed person may retain, or the court may appoint, a qualified expert to examine him. 725 ILCS 207/55(a) (West 2008). The State's motion for a finding of no probable cause in this case was based upon the first annual (18-month)

24

1-09-0796

evaluation of respondent.

Respondent's petition for discharge or conditional release in this case was filed pursuant to two sections of the Act. First, at the time of each reexamination, the detained person receives notice of the right to petition the court for discharge. 725 ILCS 207/65(b)(1) (West 2008). If the committed person, like respondent in the present case, does not affirmatively waive that right, the court must set a probable cause hearing to determine whether facts exist that warrant a hearing on whether the respondent remains a sexually violent person. 725 ILCS 207/65(b)(1) (West 2008). If the court finds that there is probable cause to believe that the respondent is no longer a sexually violent person, it must set a hearing on the issue. 725 ILCS 207/65(b)(2) (West 2008). The State carries the burden at this hearing of proving by clear and convincing evidence that the person is still a sexually violent person. 725 ILCS 207/65(b)(2) (West 2008). If the State fails to meet this burden, the committed person is entitled to be discharged. 725 ILCS 207/65(b)(3) (West 2008).

The Act also allows a person who has been committed to institutional care to petition the court for conditional release once certain time requirements have been met. See 725 ILCS 207/60(a) (West 2008). If the person files such a petition, the court must appoint one or more examiners to examine the committed person and make a written report. 725 ILCS 207/60(c) (West 2008). The State has the right to have the person evaluated by experts of its choice. 725 ILCS 207/60(c) (West 2008). The court must thereafter hold a probable cause hearing to determine whether cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if released or conditionally discharged. 725 ILCS 207/60(c) (West 2008). If the court so determines, it must hold a hearing on the issue and must grant the

25

petition for conditional release unless the State proves by clear and convincing evidence that the person has not made sufficient progress to be conditionally released. 725 ILCS 207/60(d) (West 2008). With these principles in mind, we turn to a consideration of respondent's contentions on appeal.

Respondent contends that the trial court's finding that there was no probable cause to conduct a further evidentiary hearing was an abuse of discretion and violated his fourteenth amendment right to due process of law. He claims that to satisfy due process requirements, his civil commitment must be based upon a valid mental disorder, the disorder upon which his commitment rests must be "severe," and the disorder cannot be diagnosed based solely on his past criminal behavior. Respondent claims that the trial court's finding of no probable cause runs afoul of these requirements and constitutes an abuse of discretion for three reasons.

First, respondent claims that the trial court's judgement must be reversed because the "alleged disorder" upon which his commitment rests does not exist. Respondent's argument is based upon Dr. Schmidt's testimony that paraphilia NOS, nonconsent is not a valid disorder because it is not found within the DSM.

In this case, the trial court heard conflicting expert testimony on this issue. On one hand, defendant's expert, Dr. Schmidt, testified that the diagnosis is not contained in the DSM. He explained that there has been a debate in the psychiatric community over the last 20 years as to the validity of the diagnosis but that the diagnosis has never proceeded through the formal process by which a disorder is included in the DSM. Dr. Schmidt testified that the committee he chaired voted against recommending the disorder be included in the DSM because there was "no

scientific support for the diagnosis" and because of concerns that the diagnosis could be used as a defense at rape trials. Dr. Schmidt acknowledged that the DSM contains a disorder called paraphilia not otherwise specified and that, in another section, the DSM states that the central diagnostic features of paraphilia include "recurrent, intense, sexually arousing fantasies, sexual urges or behaviors generally involving *** nonconsenting persons." However, the doctor opined that a mental health professional cannot combine these two section to conclude that the DSM contains a disorder called paraphilia NOS, nonconsent.

On the other hand, Dr. Ostrov and Dr. Suire testified that the diagnosis is valid and finds support in the DSM, even though it is not listed as a specific disorder. Both witnesses were aware of the controversy surrounding the diagnosis. However, Dr. Ostrov testified that he did not agree with the principle that if a diagnosis is not contained in the DSM it is not a widely recognized diagnosis. For example, the word "psychopath" is not found in the DSM, yet it is widely recognized among health care professionals. He explained that the DSM is a standard reference work for mental health professionals so they have a common reference point when they use terminology in the mental health field. Dr. Ostrov also testified that the examples given in the DSM for paraphilia NOS are "simply examples" that are not "exhaustive." Similar to Dr. Ostrov, Dr. Suire diagnosed respondent with the disorder despite the controversy over its validity, explaining that "there is probably nothing in the field of psychology that doesn't have some degree of disagreement."

The trial court, as the finder of fact in this case, was free to accept the opinion of one expert witness over another or accept part and reject part of each expert's testimony. See

*Lieberman*, 379 Ill. App. 3d at 600. After considering the conflicting testimony in this case, the trial court acknowledged the "disparity of opinions" on the issue and stated that there was "a good deal of subjectivity in this whole process." The court also stated that the question of the disorder's validity could not be resolved by the fact that the diagnosis is not specifically listed in the DSM. The court ultimately chose to credit Dr. Ostrov's and Dr. Suire's testimony that paraphilia NOS, nonconsent is a valid diagnosis despite the fact that it is not specifically listed in the DSM. Accordingly, the court found that respondent continues to suffer from a mental disorder that satisfied respondent's commitment under the Act.

Although respondent argues that the trial court's ruling was an abuse of discretion and violated due process, he cites no authority in which a court has found that paraphilia NOS, nonconsent does not support a finding that a person is a sexually violent person under the Act because that disorder is not specifically listed in the DSM or because not all mental health experts agree on the validity of the diagnosis. He also cites to no authority in which a court has found that due process is violated when a person is committed under a sexually violent person statute based upon a mental disorder that is not specifically listed in the DSM. Indeed, the Act does not require that there be a consensus among mental health professionals regarding a diagnosis or that the diagnosis be listed specifically in the DSM in order for that particular diagnosis to support a sexually violent person finding. Rather, the Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2008).

In this respect, we note that the United States Court of Appeals for the Seventh Circuit

recently considered a challenge to civil commitment based on the diagnosis of paraphilia NOS, nonconsent because the diagnosis "represents an extreme minority viewpoint in the profession that has been explicitly and publicly rejected by the APA in crafting the DSM." *McGee v. Bartow*, 593 F.3d 556, 573 (7th Cir. 2010).[5]  After reviewing the DSM and Supreme Court precedent, the court noted that "[w]hether a legitimate mental health diagnosis must be based on the DSM is a question for the members of the mental health profession" and that, with respect to due process concerns, "we cannot adopt any rule that asks the DSM to do what the text itself professes that it was not intended to do: answer the ultimate legal questions or create a perfect fit between law and medicine in the realm of involuntary civil confinement." *McGee*, 593 F.3d at 576.  The court then noted that "[t]he Supreme Court's cases on this point teach that civil commitment upon a finding of a 'mental disorder' does not violate due process even though the predicate diagnosis is not found within the four corners of the DSM." *McGee*, 593 F.3d at 576. Rather, the court recognized that consensus among mental health professionals and the existence of a diagnosis in the DSM are factors to be considered by the finder of fact in determining whether a diagnosis justifies civil commitment.  The court reasoned:

> "Likewise, when a particular diagnosis is not accepted or is
> explicitly rejected by the DSM or other authoritative sources, that
> factor is a highly relevant consideration for the factfinder. In either
> situation, however, the factfinder has the ultimate responsibility to

---

[5]The court was considering a committed person's petition for a writ of *habeas corpus*, challenging his commitment under the Wisconsin sexually violent person statute.

assess how probative a particular diagnosis is on the *legal* question

of the existence of a 'mental disorder'; the status of the diagnosis

among mental health professionals is only a step on the way to that

ultimate legal determination. The methodology and the outcome of

any mental health evaluation offered as evidence is a proper

subject for cross-examination, and we would expect that, in the

ordinary case, such efforts would expose the strengths and

weaknesses of the professional medical opinions offered."

(Emphasis in original.) *McGee*, 593 F.3d at 576.

The court noted the conflicting opinions in the mental health field on the validity of the diagnosis and also considered "the Supreme Court's repeated statements that states must have appropriate room to make practical, common-sense judgments about the evidence presented in commitment proceedings." *McGee*, 593 F.3d at 580. Therefore, given the conflicting views on the issue and the state of Supreme Court precedent, the court ultimately held that it could not conclude "that the diagnosis of a rape-related paraphilia is so empty of scientific pedigree or so near-universal in its rejection by the mental health profession that civil commitment cannot be upheld as constitutional when this diagnosis serves as a predicate. " *McGee*, 593 F.3d at 581.

The principle that the presence of a disorder in the DSM or disagreement among mental health professionals as to the validity of a diagnosis are merely factors to be considered by the trier of fact was illustrated by the Arizona Court of Appeals' decision in *In re Commitment of Frankovitch*, 211 Ariz. 370, 375, 121 P.3d 1240, 1245 (App. 2005). In that case, an inmate was

found to be a sexually violent person and committed to the DHS under a statutory scheme similar to the Act. The trial court later denied the inmate's petition for release or a change of status. *Frankovitch*, 211 Ariz. at 372, 121 P.3d at 1242. On appeal, the inmate argued that the diagnosis of paraphilia NOS is inappropriate because raping a nonconsenting adult woman is not recognized as a paraphilia in the DSM-IV. The inmate therefore contended that he did not have a diagnosis that met the statutory requirement for his continued confinement. *Frankovitch*, 211 Ariz. at 375, 121 P.3d at 1245. The appellate court rejected that claim, noting that the trial court had heard conflicting testimony on that issue and resolved the conflict by finding credible the expert testimony that paraphilia NOS, nonconsenting adult, is recognized as a valid diagnosis by those professionals working in the area of sexual disorders, even if it is not accepted by all psychologists and psychiatrists. The court acknowledged that the trial court was in the best position to determine the credibility of the witnesses and therefore deferred to the trial court's resolution of the conflicting evidence. *Frankovitch*, 211 Ariz. at 375, 121 P.3d at 1245.

Although neither of these decisions is binding on this court, we find the reasoning in each case persuasive and applicable to the present case. The fact that paraphilia NOS, nonconsent is not specifically listed in the DSM, as testified to by Dr. Schmidt, and the presence of disagreement among mental health professionals as to the validity of the diagnosis, as testified to by all of the expert witnesses, were simply factors for the trial court to consider when determining whether the diagnosis could support respondent's civil commitment under the Act. The trial court heard testimony from two expert witnesses that the diagnosis was in fact valid and the court concluded that respondent suffered from a mental disorder that satisfied the Act's

requirements. We cannot say that the trial court's determination was an abuse of discretion.

Respondent's arguments to the contrary essentially take issue with the weight that the trial court assigned to each expert's testimony. First, respondent claims that "considering Dr. Schmidt's world-renowned preeminence in the field of psychiatry and paraphilic disorders in particular, the trial court's wholesale rejection of his testimony in favor of the opinions of two unheralded local experts, one of whom, unlike Dr. Schmidt, did not even examine Lieberman personally, is a clear abuse of discretion."

We initially note that it was respondent who refused to be interviewed by Dr. Suire. Regardless, it is well-settled that the trier of fact, in this case the trial court, is responsible for assessing the credibility of the expert witnesses and the weight to be given to their testimony. *People v. Sims*, 374 Ill. App. 3d 231, 251 (2007); *People v. Urdiales*, 225 Ill. 2d 354, 431 (2007) ("the credibility and weight to be given psychiatric testimony are matters for the trier of fact, who is not obligated to accept the opinions of defendant's expert witnesses over those opinions presented by the State"). In this case, respondent had the opportunity to challenge the credentials and testimony of Dr. Ostrov and Dr. Suire during cross-examination of both witnesses and through the testimony of his own expert, Dr. Schmidt. See *In re Detention of Erbe*, 344 Ill. App. 3d 350, 372 (2003) (noting that "traditional methods, such as cross-examination and rebuttal witnesses, offered defendant the opportunity to challenge Buck's and Leavitt's opinions in the proper forum-that is, during trial in front of the trier of fact"). The trial court was aware of Dr. Schmidt's credentials and past work on revisions to the DSM but nevertheless found the testimony of Dr. Suire and Dr. Ostrov to be more credible and concluded that paraphilia NOS,

32

nonconsent satisfied the Act's requirements that respondent suffers from a mental disorder. Dr. Suire and Dr. Ostrov were both found by the trial court to be experts in the field of psychology and in the evaluation of sexual offenders and each witness testified as to the basis for his opinion on this issue. After reviewing the record, we find no valid reason to substitute our judgment for that of the trier of fact.

Second, respondent claims that "even if the expert testimony were evenly weighted," the "eminently qualified testimony" of Dr. Schmidt that paraphilia NOS, nonconsent does not exist as well as Dr. Suire's and Dr. Ostrov's testimony that a controversy exists over the use of the disorder in civil commitment proceeding establishes probable cause or a "reasonable ground for belief" that the disorder does not exist.

Probable cause is defined as:

> "Reasonable cause; having more evidence for than against. A reasonable ground for belief in the existence of facts warranting the proceedings complained of. An apparent state of facts found to exist upon reasonable inquiry (that is, such inquiry as the given case renders convenient and proper), which would induce a reasonably intelligent and prudent man to believe, in a criminal case, that the accused person had committed the crime charged, or, in a civil case, that a cause of action existed." Black's Law Dictionary 1081 (5th ed. 1979).

See also *In re Ottinger*, 333 Ill. App. 3d 114, 122 (2002) (quoting Black's Law Dictionary for

definition of "probable cause" as that phrase is used in the Act).

We find respondent's argument to be without merit. First, respondent's argument would render the probable cause standard meaningless. We find that probable cause is not established merely by the presence of a "disparity of opinions" or by testimony from respondent's expert witness. If this were the case, a party could always establish probable cause simply by calling an expert witness to testify on his behalf. Respondent's argument does not account for the trial court's role of making credibility determinations and assigning weight to the expert testimony or for the discretion the trial court has in determining whether a further evidentiary hearing is required on respondent's petition for discharge or conditional release. Second, the expert testimony in this case was not "evenly weighted" because the trial court exercised its discretion and chose to credit the testimony of Dr. Suire and Dr. Ostrov that paraphilia NOS, nonconsent is a valid diagnosis over Dr. Schmidt's testimony that the disorder is not valid because it is not specifically listed in the DSM. In light of the weight the trial court assigned to each expert's testimony, we cannot say that there is "more evidence for than against" the conclusion that paraphilia NOS, nonconsent is not a valid disorder.

Third, respondent claims that the trial court based its determination that paraphilia NOS, nonconsent is a valid disorder upon a mistaken belief that this court, in respondent's direct appeal from his 2006 sexually violent person trial, previously held that the disorder was valid. Respondent specifically complains of the following comments by the trial court when announcing its ruling:

"Now it seems to me that your case *** rises or falls with

34

this concept of there is no such diagnosis.

And it seems to me, *** having heard all the testimony regarding that, and that much of this hearing has been taken up with that, and rightly so, actually, it seems to me that the posture of this case is that that diagnosis has been found by the Appellate Courts of this state to exist; and, indeed, they have been found - that diagnosis has been found to exist specifically in this case and that the rule of law is that that is a - the law that applies to this case specifically is that that diagnosis will support a *** judgment that an individual is a sexually violent person.

And I haven't heard enough to think that there has been a revolutionary change in the law since that diagnosis or since that *** ruling by the Appellate Court."

In claiming that the trial court's reference was erroneous, respondent points out that there is a difference between whether respondent met the criteria for paraphilia NOS, nonconsent, an issue in respondent's direct appeal from the finding that he was a SVP, and whether the diagnosis itself is valid, an issue in this appeal.

However, respondent's argument takes the trial court's comments out of context. When read in context, the trial court did not refer to this court's previous opinion as substantive proof that paraphilia NOS, nonconsent is a valid disorder. Rather, the court was stating that in our previous opinion, we affirmed the trial court's finding that respondent was a sexually violent

person based on the fact that he suffered from a mental disorder, paraphilia NOS, nonconsent, that made it substantially probable that he would engage in future acts of sexual violence. The court was further stating that since that time, there has not been a change in the law such that the disorder would no longer support a finding that respondent was a sexually violent person. Indeed, respondent has cited to no authority in which a court has found that paraphilia NOS, nonconsent is not a valid mental disorder that supports a sexually violent person finding under the Act. Moreover, we would not find an abuse of discretion even if the trial court's reference was erroneous. Respondent places undue emphasis on the trial court's remark, which in no way detracts from the court's decision to assign more weight to the testimony of Dr. Ostrov and Dr. Suire that paraphilia NOS, nonconsent is a valid disorder despite the fact that it is not specifically listed in the DSM.

Respondent's second contention on appeal is that even if he suffers from paraphilia NOS, nonconsent, it is no longer severe enough to justify his civil confinement. Specifically, respondent asserts that Dr. Ostrov testified that respondent's paraphilia is "not severe," and that respondent's own DHS treatment team records "indisputably confirm that if he presently has a mental disorder of any kind, it is not severe." Respondent also asserts that the trial court improperly relied upon the fact that respondent has refused to participate in formal sexual offender treatment in denying his petition for conditional release or discharge.

Respondent's contention essentially amounts to a claim that the trial court abused its discretion in finding the evidence failed to establish probable cause to believe that he is no longer a sexually violent person or that it is not substantially probable that he will engage in acts of

sexual violence if released. Whether probable cause exists to warrant a further evidentiary hearing on a petition for discharge or conditional release is a matter resting in the sound discretion of the trial court. *Ottinger*, 333 Ill. App. 3d at 120. On review, this court will not substitute its judgment for that of the trial court but, rather, will only ascertain whether the trial court's determination was an abuse of discretion. *Ottinger*, 333 Ill. App. 3d at 120. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Lieberman*, 379 Ill. App. 3d at 609. For the following reasons, our review of the record establishes that the trial court's judgment was not an abuse of discretion.

The trial court heard testimony from two expert witnesses that respondent suffers from paraphilia NOS, nonconsent and that the disorder predisposes him to commit future acts of sexual violence. Dr. Ostrov testified that respondent was at a high risk of sexually reoffending and that he was therefore not a suitable candidate for conditional release. This opinion was based upon numerous factors, including respondent's past behavior and his failure to participate in formal sexual offender treatment while in the DHS treatment facility, which "has been empirically shown to decrease the risk of a person sexually reoffending." Dr. Ostrov's opinion was also based upon the results of the Static-99 test, his disbelief of respondent's claim that he essentially committed rapes due to "youthful caprice," and respondent's clinical interview, in which respondent was "cavalier" and showed a "lack of empathy" toward his victims. The doctor acknowledged that respondent's age had an impact on his likelihood of recidivism and that respondent claimed to not have acted out sexually while in the IDOC and the DHS treatment

facility. However, Dr. Ostrov explained that this claim must be viewed in context of the fact that respondent is in a controlled environment and does not have access to his preferred sexual stimuli. Dr. Ostrov concluded that the ultimate question was whether respondent had decreased his risk of sexually reoffending to the point where it would be tolerable for him to be on conditional release. In the doctor's opinion, other than respondent's age and the fact that he has not acted out sexually while detained, he did not see evidence that respondent had significantly decreased his risk of reoffending and he therefore did not recommend that respondent be conditionally released.

The trial court also heard testimony from Dr. Suire, who opined that to a reasonable degree of psychological certainty, it was substantially probable that respondent would commit new acts of sexual violence if released, that respondent remains a sexually violent person, and that respondent has not made sufficient progress to allow him to be safely managed in the community. The doctor's opinion was based upon his paraphilia diagnosis as well as his opinion that respondent suffers from cannabis abuse and narcissistic and anti-social personality disorders. Dr. Suire's risk assessment of respondent was also based upon his review of various records and the results of the Static-99 and MNSOST-R actuarial instruments, both of which placed respondent in a "high-risk" category. Finally, Dr. Suire considered what he referred to as "protective factors," such as age and treatment progress, which could reduce respondent's risk of sexually reoffending. The doctor acknowledged that increased age can correlate to a decreased risk of reoffending, but he did not consider respondent's age to be a significant protective factor because respondent was a "high-risk" offender. Further, treatment progress did not reduce

respondent's risk because he had refused to participate in core sexual offender treatment, which "can substantially reduce the risk of sexually reoffending."

In contrast to the testimony of these two expert witnesses, the trial court heard testimony from defendant's expert, Dr. Schmidt. Dr. Schmidt testified that respondent does not suffer from a paraphilia and this opinion was based upon the doctor's evaluation of respondent and his review of various documents. Dr. Schmidt believed that respondent's pre-rape history could be relevant to explain why he committed multiple rapes. The doctor noted respondent's explanation of an instance when a woman initially refused to have intercourse with him but later consented and his claim that as a result he believed that "when women say no they really mean yes." The doctor further noted that respondent was acting "selfishly for his own sexual gratification" and that he felt he "was immune from the law." According to Dr. Schmidt, these experiences provide "as plausible an explanation as maybe we'll ever get" as to why respondent committed numerous rapes. In arriving at his conclusion, Dr. Schmidt also considered that respondent had a "fairly normal heterosexual development" during his adolescent years, that there were no reports of respondent exhibiting sexual coercive behavior toward prisoners of the female staff, and that respondent's GAF scores indicated his symptom severity and functional capacity had "increased dramatically" and were "pretty close to normal at this time." However, Dr. Schmidt never testified that respondent was a suitable candidate for discharge or conditional release. He provided no testimony that in his professional opinion, respondent was no longer a sexually violent person or that it was not substantially probable that respondent would engage in acts of sexual violence if released.

The trial court also heard testimony from respondent regarding the fact that while in the DHS treatment and detention facility, he had married, founded a facility band, taken classes and written for the institutional newsletter. Respondent testified to his "intermediate-A status" in the detention facility and why he refused to participate in the core sexual offender treatment program. Respondent further stated that if he was released, he would live with his wife, work at a law firm, and participate in drug and alcohol testing as well as counseling or therapy.

After hearing all of this evidence, the trial court stated that it found the Dr. Suire and Dr. Ostrov to be "quite credible" witnesses and that it did not find respondent's testimony to be "credible at all, quite frankly." The court also noted that Dr. Schmidt's testimony as to why respondent committed so many rapes if he did not have a paraphilia was "absolutely, totally, completely absurd, quite frankly." The court noted that there was "an improvement to some extent in [respondent's] condition," pointing to respondent's GAF scores and his acknowledgment that he had committed some of the crimes with which he was charged. However, considering that respondent had refused to participate in the sexual offender treatment program as well as the other testimony presented at the hearing, the court concluded that respondent had failed to make sufficient progress to be conditionally released or discharged. Accordingly, the court found that there was not probable cause to believe that respondent was no longer a sexually violent person or that it was not substantially probable that he would engage in acts of sexual violence if released. After considering the testimony presented at the hearing, and considering the trial court's credibility determinations and the weight it assigned to the testimony, we cannot say that the court's judgment was "arbitrary, fanciful, [or] unreasonable,"

or that "no reasonable person would take the view adopted by the trial court." *Lieberman*, 379 Ill. App. 3d at 609. Accordingly, the trial court's denial of respondent's petition for conditional release or discharge was not an abuse of discretion. See *Ottinger*, 333 Ill. App. 3d at 122 (affirming the trial court's denial of the defendant's petition for discharge or conditional release where there were no facts demonstrating that the defendant could control his behavior outside of a controlled environment, where the defendant did not consistently attend treatment classes, and where the expert found that the defendant continued to be a substantial risk to sexually reoffend).

Respondent nevertheless claims that Dr. Ostrov testified that "if respondent presently has a paraphilia of any kind, it is not severe." This portion of the doctor's testimony, however, is taken out of context. Dr. Ostrov initially testified that "a paraphilia itself is severe" and that he was "not sure what a moderate or mild one would be." The doctor acknowledged that in his prior deposition he stated that respondent's paraphilia is not severe "in the environment he is in," in the sense that respondent "is not preoccupied by it" and he "has not sexually acted out." However, the doctor testified that "the critical words in there is, 'in the environment he is in.'" Dr. Ostrov also expanded on this statement in other portions of his testimony. He testified that respondent's claim that he has not acted out sexually or that he was not "preoccupied by it" must be viewed in context of the fact that he has not been around his preferred sexual stimuli. Specifically, Dr. Ostrov explained that people with paraphilia act much differently when they are aroused by being in contact with their preferred stimuli than they do when that stimuli is not present. When someone with paraphilia is aroused, his ability to control himself and to consider the consequences of his actions is "markedly" decreased. In the same respect, the doctor

41

explained that some people act out in prison and some do not, and that in the case of those who do not, this may be because that person has changed or it may be because that person "does not have the opportunity to commit the crime they are predisposed to commit." In respondent's case, his access to men was not relevant because there was no past instance of him being sexually interested in men. Moreover, any access that respondent had to woman was "certainly not the kind of access he had when he was out in the community" because "there was always some level of surveillance."

When viewed in context, this isolated statement by Dr. Ostrov does not establish probable cause to believe that respondent is no longer a sexually violent person or that it is not substantially probable that he would engage in acts of sexual violence if released. This is particularly true considering that Dr. Ostrov's overall opinion was that respondent suffers from a mental disorder, paraphilia NOS, nonconsent, that he was at a high risk of sexually reoffending, and that he should not be released into the community. Moreover, even if Dr. Ostrov's statement regarding the severity of respondent's paraphilia were made in the context that respondent suggests, which it was not, the trial court was free to accept or reject as much or as little of his testimony as it saw fit. See *Lieberman*, 379 Ill. App. 3d at 600. The overall opinions of Dr. Ostrov and Dr. Suire more than supported the trial court's denial of respondent's petition for conditional release or discharge.

Respondent also claims that his GAF score, which measures his symptom severity and level of functioning and is determined by his DHS treatment team, indicates that his paraphilia is not severe. Respondent further claims that the trial court's judgment was an abuse of discretion

because the court improperly focused on respondent's refusal to participate in formal sexual offender treatment and did not consider his GAF score or Dr. Ostrov's testimony that respondent's paraphilia is not "severe."

However, the record shows that the trial court considered all of these factors when it denied respondent's petition. The court was aware of Dr. Schmidt's testimony regarding respondent's current GAF score and that this score measures symptom severity and level of functioning. The court specifically noted that there had been "an improvement in things," that respondent's GAF score "has improved, " and that it was a "positive" that respondent had been "functioning fairly well in his present environment." However, the court also noted that Dr. Ostrov, whose testimony the court found to be "quite credible," had specifically considered respondent's GAF score in arriving at his expert opinion. Moreover, as noted above, the court could have also considered Dr. Ostrov's statement regarding the severity of respondent's paraphilia in context of the rest of the doctor's testimony regarding how a person with paraphilia acts when not around his or her preferred stimuli. The trial court, as it was entitled to do, chose to credit Dr. Ostrov's overall testimony that, despite respondent's GAF score and other positive things he had done while in the DHS treatment facility, he suffers from paraphilia NOS, nonconsent and was at a high risk of reoffending.

Finally, we find nothing improper in the trial court's consideration of respondent's refusal to participate in formal sexual offender treatment. Respondent claims that such treatment is not a prerequisite to discharge or conditional release and claims that, under section 55 of the Act, the criteria for conditional release or discharge is whether respondent has made "sufficient progress."

43

See 725 ILCS 207/55(a) (West 2008).

However, in addition to the language in section 55 of the Act, the trial court was evaluating respondent's petition for discharge or conditional release. The court was therefore required to determine whether there was probable cause to believe that respondent is no longer a sexually violent person and whether it was not substantially probable that respondent will engage in future acts of sexual violence. See 725 ILCS 207/65(b), 60(c) (West 2008). In any event, we find no error in the trial court's consideration of respondent's refusal to participate in formal treatment given that Dr. Suire and Dr. Ostrov each testified that such treatment can significantly decrease the likelihood that a person will sexually reoffend. See, *e.g.*, *In re Detention of Cain*, 341 Ill. App. 3d 480, 483 (2003) (trial court properly found that probable cause did not exist to conclude that the defendant was no longer a sexually violent person entitled to release where, among other things, the defendant "remained exceedingly resistive to clinical treatment and instead focused his efforts primarily on legal issues"); *In re Commitment of Blakey*, 382 Ill. App. 3d 547, 552 (2008) (trial court did not commit error when it found no probable cause to warrant a further evidentiary on defendant's petition for conditional release where the defendant had not yet participated in any sex-offender-specific treatment program); *Ottinger*, 333 Ill. App. 3d at 121-22 (affirming denial of petition for release or discharge where, among other things, expert noted that the defendant required further intensive and secure treatment, did not consistently attend treatment classes, reported that treatment did not help and that he would rely on "common sense" to prevent recurrence, and where the defendant's treatment progress was "painfully slow"). Moreover, the trial court never suggested that the overall standard it used to evaluate

respondent's petition was whether he participated in treatment. After the court noted respondent's refusal to participate in treatment, it stated that "when you add that to the whole mix of what I heard," respondent had not shown that he had made sufficient progress to be released into the community. Thus, the record shows that the trial court considered all of the evidence presented at trial and, after weighing that evidence, denied respondent's petition for discharge or conditional release. As we have already found, that determination was not an abuse of discretion.

Respondent's final contention is that the trial court's judgment should be reversed because the alleged disorder upon which respondent's commitment rests is based solely upon his past criminal behavior. Specifically, respondent claims that Dr. Suire and Dr. Ostrov diagnosed him with paraphilia NOS, nonconsent based solely on his past criminal behavior and that this diagnosis is the only one which supports his civil commitment. Therefore, respondent asserts that the court's finding of no probable cause "is unconstitutional on due process, double jeopardy, and *ex post facto* grounds."

Respondent's contention is without merit. Our supreme court has already held that the Act is not subject to challenge on either double jeopardy or *ex post facto* grounds. See *In re Detention of Samuelson*, 189 Ill. 2d 548 (2000). The court held that proceedings under the Act are civil rather than criminal in nature and that confinement pursuant to the Act is not punitive. Therefore, the initiation of commitment proceedings under the Act does not constitute a second prosecution for double jeopardy purposes. *Samuelson*, 189 Ill. 2d at 559. The court also held that the Act does not implicate *ex post facto* concerns because it does not have retroactive effect.

45

The court explained that a defendant "cannot be involuntarily committed based on past conduct" but, rather, "[i]nvoluntary confinement is permissible only where the defendant presently suffers from a mental disorder and the disorder creates a substantial probability that he will engage in acts of sexual violence [if released]." *Samuelson*, 189 Ill. 2d at 559. In reaching these conclusions, the court relied upon the United State's Supreme Court's decision in *Kansas v. Hendricks*, 521 U. S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997), in which the United States Supreme Court considered the constitutional validity of a Kansas statute similar to the Act and held that it did not raise *ex post facto* concerns or violate the prohibition against double jeopardy. In that case, the Court reasoned that the statute at issue "does not affix culpability for prior criminal conduct," but instead "such conduct is used solely for evidentiary purposes, either to demonstrate that a 'mental abnormality' exists or to support a finding of future dangerousness." *Hendricks*, 521 U. S. at 362, 138 L. Ed. 2d at 505, 117 S. Ct. at 2082.

We find nothing in the record that would distinguish this case from the holding in *Samuelson*. Respondent is correct that Dr. Ostrov's opinion that respondent continues to suffer from paraphilia NOS, nonconsent was based on police reports, convictions, and respondent's own testimony which showed "repeated instances of non-consensual sex directed to different women over a period of time longer than six months" as well as the fact that respondent's behavior "caused him enormous impairment in social and occupational and other areas of functioning." Moreover, Dr. Suire did testify that his paraphilia diagnosis was based on respondent's past criminal behavior. However, as explained in *Samuelson*, this does not mean that respondent is being punished or detained for his past criminal behavior. Rather, respondent

46

is being detained because, among other things, he presently suffers from a mental disorder that creates a strong probability that he will engage in future acts of sexual violence. We therefore find no constitutional violations arising out of respondent's continued commitment under the Act.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

J. GORDON, and R.E. GORDON, J.J., concur.